# Richmond

## J. F. FRIEDBERG, ET AL. V. RIVERPOINT BUILDING COMMITTEE

November 23, 1977.

Record No. 761297.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*Robert M. White (White and Selkin,* on briefs) for plaintiffs in error.

*James C. Howell (Willcox, Savage, Lawrence, Dickson & Spindle, P.C.,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the Court.

The broad question which confronts us in this appeal, in a declaratory judgment proceeding at law, is whether the owners of a platted lot in a residential subdivision may resubdivide and build on the newly created parcels, under the circumstances of this case, considering the applicable restrictive covenants.

In an amended motion for judgment, appellants J. F. Friedberg and Martha Friedberg, his wife, proceeded against Riverpoint Building Committee, the defendant below, seeking a declaration that "plaintiffs have the right to subdivide their property in the manner set forth [in the amended motion]; and

that they have the right to proceed with the construction of the residential dwelling described [therein]." After a trial without a jury, the court below found that the plaintiffs failed to establish their right to subdivide and further found that the dwelling in question did not conform to the restrictive covenants, as applied and administered by the defendant Committee. Accordingly, the plaintiffs' action was dismissed in a June 1976 order, from which we granted plaintiffs a writ of error.

In early 1941, approximately 100 acres of "highland" in the City of Norfolk was conveyed by deed, with a plat attached, to Riverpoint Corporation. The tract, to be developed as a residential subdivision, was bounded on the east by Granby Street and on the west and south by branches of the Lafayette River. Shown on the plat were 230 lots, in 18 blocks, plus Sites A, B, C (the property in controversy here), D, E and F. The great majority of the lots contained an area which exceeded 7500 square feet; most of these symmetrical parcels had from 9,000 square feet to 15,000 square feet of space. There were at least three platted, but undesignated, irregular-shaped parcels of less than 7500 square feet, located adjacent to areas reserved for boat basins. The "Sites", waterfront lots much larger in area than the inland parcels, were located on each of six peninsulas extending into the river. At least three other such points of land were not denominated "Sites" and were divided into designated lots. Also, a large area near the center of the tract was undivided and designated "Proposed Park and Playground".

The evidence showed that the six Sites, each abutting a cul-de-sac, served to increase circulation of land and water breezes between the interior of the development and the Lafayette River. These large lots on the water also encouraged construction of more expensive homes on the parcels, thus "upgrading" the surrounding neighborhood and preserving property values.

Restrictive covenants governing the use of the land conveyed were set forth in the deed and, insofar as pertinent to this appeal, provide as follows:

"*A.* All lots in the tract shall be known and described as residential lots, except the lots located in Blocks Numbers 2 A and 5 which may be used for business purposes. No structures shall be erected, altered, placed or permitted to remain on any residential lot other than one detached single

family dwelling not to exceed two and one half stories in height and a private garage for not more than two cars, and appurtenant outbuildings, except that private garages for not more than three cars may be erected on lots 5, 6, 7, and 8, in block 16, on lots 2 to 7 inclusive, in block 14, on lots 2 to 4 inclusive, in Block 12, and on Sites A, B, C, D, E, and F.

"*B.* No building shall be erected, placed, altered or installed on any building plot in this subdivision until the building plans specifications and plot plan showing the location of such building have been approved in writing as to conformity, and harmony of external design, with existing structures in the subdivision and as to location of the building with respect to property and set back lines by a committee composed of . . . .

\* \* \*

"*D.* No residential structure shall be erected or placed on any building plot, which plot has an area of less than 7500 square feet."

The evidence showed that the defendant Committee, in administering paragraph B in order to attain dwelling "conformity, and harmony of external design," and to keep "cracker boxes out", had consistently required that homes in Riverpoint have two useable stories or, if they contained only one story, that the structure, including enclosed porches and garages, contain 3000 square feet of space. In addition, if a planned one-story home contained less than 3000 square feet of area, the Committee required that dormer windows be included, to give the impression that the home had more useable space. The testimony showed that, although no common style of architecture had been required, the square-footage standards had been uniformly enforced by the defendant, which resulted in the maintenance of "a relatively stable, high-class residential area".

In 1963 plaintiff Martha Friedberg purchased Site C, upon which was located a one-story house with about 3500 square feet of space. The land area approximated 75,000 square feet or about "an acre and three quarters", a significant percentage of which was "lowland". The deed of conveyance was expressly made

subject to the foregoing restrictions. Mrs. Friedberg testified that when the property was brought, she had no intention of subdividing it but planned to use it for residential purposes.

In 1969, a plat of survey was recorded which showed the dividion of Site C into two parcels, one containing 0.30 acres and the other 1.45 acres. Mrs. Friedberg testified that she made this subdivision, apparently without prior notice to the defendant Committee, because she was afraid "to live out there [on the point]" alone, stating that she "would have liked" for her son to build a home there and live "next door" to her. In 1972 the home on Site C was destroyed by fire.

By a letter dated in May of 1973, the chairman of defendant Committee advised Mrs. Friedberg that "attention has been invited to the re-subdivision of Site C which you made of this property [in 1969]." The letter stated that such action on her part "would indicate that you at sometime might attempt to sell these two separate parcels as separate sites for two individual residences." The letter then said that pursuant to paragraph A of the restrictions, "only one single-family dwelling can be placed on your original Site 'C'."

In 1974, plaintiffs employed surveyors who subdivided Site C into three building sites and a plat to this effect was duly recorded in January of 1975. The Site is divided longitudinally into three pracels, C-1, C-2 and C-3, the two nearly parallel lines of division extending from the edge of the water inland to an original cul-de-sac adjacent to the Site. Parcels C-1 and C-3 have an area of about 20,000 square feet; parcel C-2 has approximately 35,000 square feet of space.

During the Fall of 1975, the plaintiffs began construction of the house in question on parcel C-2, without notice to the Committee. Upon information received from one of plaintiffs' neighbors, Edward S. Ferebee, a retired attorney and chairman of the defendant Committee, went to the site and found the plaintiffs' building contractor preparing to commence work. Ferebee notified the builder of the advance approval required by paragraph B of the restrictive covenants. Approximately two weeks later, the plans were submitted to the Committee and were rejected because: (1) the proposed home consisted of one story and contained less than 3000 square feet without dormer windows, and (2) the plans showed that the original site had been divided into three building lots. Nevertheless, construction

proceeded and the house was completed in May of 1976, about six months after this action was filed. The plaintiffs' architect testified at trial that the house contains 2880 square feet and that the original contract price was $74,000.

The parties agree that the first issue is whether the trial court erred in holding that the "plaintiffs failed to prove that they had a right to subdivide their property". Actually, the question is whether the restrictive covenants prohibit the subdivision of originally platted sites into smaller building lots.

Plaintiffs point out that the restrictions do not expressly prohibit a resubdivision of their property and, citing the principle of strict construction of such covenants, contend that a resubdivision of Site C into three parcels is a proper utilization of their property. They note that paragraph A expressly limits the size of the dwellings to two and one-half stories in height and limits the sizes of garages permitted, saying that "surely if resubdivision were prohibited, it would be mentioned."

At the bar, plaintiffs commented on the use of "lot" and "Site" in paragraph A and the use of "plot" in paragraphs B and D, but urged that all three terms are used synonymously. They say that if, as defendant contends, the language of paragraph A controls to prohibit resubdivision, then paragraph D contradicts A, or at least renders A "hopelessly ambiguous". This is because D provides that each building plot must have an area of 7500 square feet, and

> "There would be no point in putting Covenant D in unless a [re]subdivision was contemplated, *as every original lot on the plat of Riverpoint contained at least 7,500 square feet.* Of course, each lot created by plaintiffs' [re]subdivision contains much more than 7,500 square feet and could be utilized as a building 'plot'." (Emphasis supplied).

Preliminarily, defendant focuses on the sense in which the word "subdivided" is used in this case and, accusing plaintiffs of giving the term a loose meaning, says the Friedbergs argue a point not in issue. Defendant Committee states that it

> "is not empowered to nor has ever attempted to control sales of portions of lots or the consolidation of lots. The transfer of such lot segments, usually between adjoining landowners, does not require any notice to the Committee at all but is entirely at the discretion of the contracting parties.

"It is only when an attempt is made to build more than 'one detached single-family dwelling' on a platted lot that the protective covenants apply and the action of the Committee is invoked. Therefore, the [plaintiffs] may sell any portion of their lot they desire in 'subdivision' thereof, but they cannot arbitrarily create three residences where only one was intended, which fact they knew when they purchased the property."

The record discloses that many of the platted lots have been redivided, in most instances resulting in the combination of three lots into two parcels or the creation of larger lots by additions from adjacent parcels. The evidence further shows, however, that at no time has the single-dwelling restriction been violated.

Defendant goes on to argue that the provision in paragraph D does not derogate from the limitation in A of one dwelling on each original lot, but rather D was designed to meet several contingencies, to be discussed *infra*, and is thus entirely consistent with the restriction in A. We agree with defendant.

Valid covenants restricting the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains. *Riordan* v. *Hale*, 215 Va. 638, 641, 212 S.E.2d 65, 67 (1975); *Traylor* v. *Halloway*, 206 Va. 257, 259, 142 S.E.2d 521, 522-23 (1965). Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property. *Schwarzschild* v. *Welborne*, 186 Va. 1052, 1058, 45 S.E.2d 152, 155 (1947).

But if it is apparent from a reading of the whole instrument that the restrictions carry a certain meaning by definite and necessary implication, then the thing denied may be said to be clearly forbidden, as if the language used had been in positive terms of express inhibition. *Whitehurst* v. *Burgess*, 130 Va. 572, 576-77, 107 S.E. 630, 631-32 (1921). This is such a case.

A close examination of paragraphs A and D discloses the weakness of plaintiffs' argument and the strength of defendant's. Because of the use of different terms, the beginning inquiry must be: Are "Sites" and residential "lots" synonymous? The parties agree that they are, and this position is supported by

the language of paragraph A. The first sentence provides that "all lots" in the tract shall be residential lots, except certain lots in two blocks which may be used for business purposes. That sentence does not say all "originally platted lots", but, looking only at paragraph A, "all lots" could have no other meaning. The first and second clauses of the second sentence specify the type, size and number of structures which are permitted to be on the "residential lot". Significantly, the third clause of that sentence allows garages for three cars on 13 originally designated numbered lots *and* on the six originally designated Sites. Thus, we see that in excluding the Sites along with the 13 lots from the prohibition against three-car garages, the terms "Sites" and "lots" are both treated alike in A. Consequently, the first clause of the second sentence assuredly means that only one dwelling may be erected on any residential lot *or Site.* But for the existence of paragraph D, this would end the inquiry, because A, standing alone, would clearly prohibit resubdivision of an original Site into building lots.

Paragraph D, however, prohibits erection of a residential structure on any "plot" (including any "lot" or "site"*) having an area less than 7500 square feet. If plaintiffs are correct that "every original lot on the plat of Riverpoint contained at least 7500 square feet", then, as they argue, paragraph D would be meaningless *unless* resubdivision into building parcels was contemplated and not prohibited. But the plaintiffs' factual premise is not entirely accurate, and therein lies the flaw in their position.

While it is true that every original lot, *which was designated by either number or letter* as a building lot on the plat, contained at least 7500 square feet, there were also other pieces of land within the subdivision which were undesignated as lots or Sites. At least three of these, all less than 7500 square feet, were near the boat basins; another was the large area planned for use as a park and playground. It becomes obvious, then, as we examine the plat, together with the restrictive covenants, that the defendant's analysis is correct and that paragraph D does not contemplate resubdivision but was designed for several contingencies. First, D assures purchasers of residential lots

---

* Plaintiffs, as we have said, page 664 *supra,* agree that the three terms have the same meaning in the context of these restrictions.

that dwellings would not be erected on the small parcels and that, if the park area was later divided into building lots, those lots would be at least 7500 square feet in size, thereby maintaining the developmental pattern. Second, D was designed to prevent the erection of a residence upon a small remaining portion of an original full-size lot when there had been a transfer of the larger original portion, even though no dwelling may have been built on the larger portion.

In sum, we believe that the instrument in question, that is, the deed conveying the tract to the developer, which includes the plat and restrictive convenants, viewed in its entirety, by definite and necessary implication means that resubdivision of originally platted lots and sites into building parcels is prohibited in Riverpoint.

Plaintiffs rely on a number of cases from this and other jurisdictions, all of which are distinguishable on their facts, and lay particular emphasis on *Callaham* v. *Arenson*, 239 N.C. 619, 80 S.E.2d 619 (1954). But in that case, which permitted resubdivision and in which the restrictions prohibited more than one dwelling on "any residential plot", all the area was platted and every lot (save one which was specially treated in the restrictions) greatly exceeded the minimum lot size established by the covenants.

■ The second question is whether the rejection of plaintiffs' building plans, because the one-story house contained less than 3000 square feet and no dormer windows, constituted reasonable enforcement of that part of paragraph B of the covenants providing for approval "as to conformity, and harmony of external design, with existing structures in the subdivision." Plaintiffs contend that defendant's "unwritten restriction" is "arbitrary and capricious, and there is no rational basis for [its] existence". We do not agree.

Ferebee, who has served as chairman of the defendant Committee since its inception, testified that by the end of World War II only about six homes had been built in Riverpoint; three were large two-story homes and three were smaller dwellings with dormer windows. Consequently, as development progressed after 1946, the Committee established the standard disputed here in order to maintain the "level of architecture of the buildings in the neighborhood". The Committee was of opinion, according to Ferebee, that in a small house of one story, a

dormer gave the "outward appearance ... that there was useable space on the second floor", which added "dignity" and "value" to the dwelling. While conceding that plaintiffs' was a "nice house" and "expensive", even though non-complying, Ferebee maintained that the Committee could not properly function in administering the restrictions unless the same standard was applied to all lot owners. He testified that "we have applied this rule without exception in every instance that has come before the committee" and that "[e]verybody else thought the restrictions were reasonable and they listened to our objections with the exception of Mrs. Friedberg."

Generally, a restrictive covenant for a residential subdivision which requires consent to construction or approval of plans of construction, even though the provisions of the restrictions do not establish standards of approval, will be declared valid when such covenants apply to all the lots as a part of a uniform plan of development. But such covenants will be enforced only when there has been a reasonable employment of such restrictions. Annot., 40 A.L.R.3d 864, 870, 871.

We think the evidence here establishes that the standards fixed by the Committee were not improper and that they have been applied reasonably. Consequently, they should be enforced in this case. As development accelerated in 1946, the Committee followed the mandate of paragraph B and created rules to require the building of dwellings which were in "harmony of external design, with existing structures in the subdivision." It was felt that the inside dimension of a proposed building as it affected the exterior appearance was an important consideration as the defendant sought to nurture and control the growth of this residential community. Understandably, the Committee considered that a home with comparatively small interior floor space would give an outward appearance of smallness, an effect which could be offset, in part, by dormer windows. We cannot say as a matter of law that such a requirement under the circumstances of this case is improper.

As to the employment of the standard, it has been applied uniformly, consistently and in good faith during the last thirty years. Plaintiffs dwell on the fact that their home is only approximately 120 square feet substandard. But the line must be drawn somewhere, if it is to be drawn at all. We see nothing

unreasonable in adherence to a fixed requirement such as this when it has been applied evenhandedly without exception during the whole existence of the subdivision.

For these reasons, the judgment of the trial court will be

*Affirmed.*