**VIRGINIA:**

In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond, on Friday, the 15th day of September, 1995.


Norton Bowman,                                                    Appellant,

  against Record No. 941911
          Circuit Court No. 125CH93003286-00

Wintergreen Property Owners Association, Inc.,          Appellee.

Upon an appeal from a judgment rendered by the Circuit Court of Nelson County on the 12th day of August, 1994.


Upon consideration of the record, briefs, and argument of counsel, the Court is of opinion that there is no error in the judgment appealed from. Accordingly, the judgment is affirmed. The appellant shall pay to the appellee thirty dollars damages.

JUSTICE WHITING, with whom JUSTICE LACY and JUSTICE KEENAN join, concurring in part, and dissenting in part.

Unlike the majority, which decides this case without stating the facts or giving a reason for its decision, I think there was error in the chancellor's judgment and I believe that some explanation should be given to the litigants. Accordingly, I find it necessary to state the facts in order to explain my reasons for dissenting to a part of the majority's order.

This appeal arises from Norton Bowman's display of certain articles of personal property outside his house in the Wintergreen Resort residential subdivision (Wintergreen) in Nelson County. The display in question included three cow skulls, two pairs of cow horns, three neon signs reading "Aspen," "Key West," and

"Margaritaville," and a bar and murals attached to the outside of Bowman's residence. Also, either on the outside deck of his house or in his yard, Bowman displayed a lighted Christmas tree silhouette, the statues of two deer, five pastel, beach-style umbrellas, eight lighted wicker deer structures, seven lighted artificial cactus and palm plants, eight wooden figures representing cowboys and Indians, two lighted pink flamingos, and two wooden owls.

Wintergreen Property Owners Association, Inc. (the association) sued Bowman to enjoin his display of these and other articles without its permission or approval as violations of the following Wintergreen restrictive covenants:[1]

> 1. No building, fence or other structure shall be erected, placed or altered nor shall a building permit for such improvement be applied for on any property in Wintergreen until the proposed building plans and specifications, showing floor plans, the front elevation, exterior color or finish, a plot plan detailing the proposed location of such building or structure, drives and parking areas, a landscape plan, a pollution control plan . . . and the construction schedule shall have been filed with and approved in writing by [the association], its successors or assigns. Refusal of approval of plans, location or specification may be based by [the association] upon any ground, including purely aesthetic conditions, which in the sole and uncontrolled discretion of [the association] shall seem sufficient. No alteration in the exterior appearance of any building or structure shall be made without like approval by [the association]. . . .

> 5. No signs shall be erected or maintained on any property by anyone including, but not limited to, the owner, a realtor, a contractor or subcontractor, except with the written permission of [the association] or except as may be required by legal proceedings. If such permission is granted, [the association] reserves the right to restrict size, color and content of such signs.

---

[1]The association is the successor to the developer which imposed these restrictions.

Residential property identification and like signs not exceeding a combined total of more than one (1) square foot may be erected without the written permission of [the association].

6. It shall be the responsibility of each property owner and tenant to prevent the development of any unclean, unsightly or unkept conditions of buildings or grounds on such property. No outside burning of wood, leaves, trash, garbage or other refuse shall be permitted on any Property.

Following an <u>ore</u> <u>tenus</u> hearing, the chancellor agreed with the association's construction of the restrictive covenants regarding the above articles and required Bowman to remove them unless he obtained association approval. Bowman appeals.[2]

The controlling principles are set forth in <u>Friedberg v. Riverpoint Bldg. Comm.</u>, 218 Va. 659, 665, 239 S.E.2d 106, 110 (1977), as follows:

Valid covenants restricting the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains. . . . Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property. . . .

But if it is apparent from a reading of the whole instrument that the restrictions carry a certain meaning by definite and necessary implication, then the thing denied may be said to be clearly forbidden, as if the language used had been in positive terms of express inhibition. . . . (Citations omitted).

Bowman argues that his neon signs did not require association approval under the provisions of restriction 5 because they were not "advertisement[s]" but a "display of neon art," reflecting

---

[2]The association has not assigned cross error to the chancellor's judgment that Bowman did not violate the restrictive covenants in locating a hot tub and twelve globe lights outside his residence.

places he had visited and the signs were intended to be illuminated only during his occupancy of the premises. I agree with the association that the plain language of restriction 5 specifically covers Bowman's sign display even if it could be considered "neon art." Thus, I would affirm that part of the chancellor's opinion.

Turning to restriction 1, particularly its language that "[n]o alteration in the exterior appearance of any building or structure shall be made without like approval by [the association]," I disagree with Bowman's claim that, as used in this sentence, the word "alteration" limits association approval to those changes that are structural modifications of the exterior of any building or structure. Instead, I agree with the association's contention that, consistent with the context of this sentence and the remaining language of restriction 1, the word "alteration clearly encompasses any change or alteration in the exterior of Bowman's residential structure." The requirement of association approval of building plans and specifications, front elevations, and exterior colors and finishes in the first sentence of restriction 1 makes it plain that a similar approval is required for an alteration or change in the exterior appearance of any residence by the attachment of personal property thereto. Hence, I agree that association approval was required for those items of display attached to Bowman's house.

However, I disagree with the association's contention that Bowman's display of the other personal property in his yard and on the deck of his residence was subject to restriction 1. The

chancellor held that these objects "come within the terms of the [restriction 1]" because they "alter the exterior appearance of the structure" and, thus, their display requires association approval.  On the contrary, I would hold that Bowman's yard display was not an alteration in the appearance of his <u>residential structure</u> requiring association approval, but an alteration in the appearance of his <u>yard</u>, clearly not subject to such approval.

Nor do I agree with the association's contention that a prohibition of "alteration[s] in the exterior appearance of any building or structure" <u>unambiguously</u> requires association approval of Bowman's placement of pastel umbrellas and other personal property on the deck of his residence.  If restriction 1 is unambiguous, there is no need for construction and we simply apply the language as written.  <u>Moore v. State Farm Mut. Auto. Ins. Co.</u>, 248 Va. 432, 435-36, 448 S.E.2d 611, 613 (1994).  Yet, instead of applying the restriction as written, the association construes "no alteration in" to mean "no items which alter."  And even this "amended" language needs further construction to permit the conclusion that nothing may be displayed on the residence or its deck without association approval, although not attached to either the residence or the deck.  Thus, the association itself demonstrates that the language is ambiguous and merely advances one construction of that language.

I think a better construction of this provision of restriction 1 is that association approval is limited to those articles which are <u>attached</u> to the residence or deck and thus alter the appearance of the <u>structure</u>.  This construction is

reinforced when this provision is considered in context with the earlier provisions in restriction 1 requiring association approval for the construction of buildings, fences, structures, drives, parking areas, landscape plans, and pollution control plans. In any event, any doubt or ambiguity in the scope of any restrictive covenant is to be resolved against the restriction and in favor of the free use of property. <u>Williams v. Brooks</u>, 238 Va. 224, 228, 383 S.E.2d 712, 714 (1989); <u>Friedberg</u>, 218 Va. at 665, 239 S.E.2d at 110. Hence, I think the chancellor erred in requiring association permission for Bowman's display of the articles of personal property that were simply placed on the deck of his residential structure.

Next, I consider the chancellor's alternative ground for enjoining Bowman's display. The chancellor also held that Bowman's display was an "unsightly condition" "in relation to the general appearance and scheme of development at Wintergreen," and hence a violation of restriction 6. Although the chancellor gave no further explanation for his ruling, the association claims the following additional language from the restrictive covenants supports his holding: "The primary purpose of these covenants and restrictions and the foremost consideration in the origin of same has been the creation of a community which is aesthetically pleasing and functionally convenient."

However, the specific purpose of restriction 6 is "to prevent the development of any unclean, unsightly or unkept conditions of buildings or grounds." I do not think that this language can be converted into a restriction against the creation of a display

some people may consider aesthetically displeasing. In extending the scope of the restriction beyond its clear purpose, I think that the chancellor read the word "unsightly" out of context for the reasons which follow.

First, I consider that the purpose of restriction 6 is "to prevent neglect in the subdivision by requiring lot owners to take action "to prevent the development of any unclean, unsightly or unkept conditions." Stated another way, restriction 6 is aimed at a lot owner's neglect or failure to act in maintaining his property.

On the other hand, an aesthetically displeasing display usually is the result of some affirmative act; it does not occur by neglect. It is not usually regarded as a "condition[]," which, in relation to an inanimate object, usually alludes to the state of its cleanliness or repair. And the language of restriction 1 requiring association approval of "the proposed building plans and specifications," a "plot plan," a "landscaping plan," and a "pollution control plan," and subjecting such approval to "purely aesthetic conditions," demonstrates a familiarity, not only with the difference between a neglected property and one that is aesthetically displeasing, but also with the method of subjecting certain parts of the lot owner's property to the aesthetic judgment of the association.

My second reason for concluding that the chancellor read the word "unsightly" out of context is that the enumeration of "unclean," "unkept," and "unsightly" as common modifiers of the word "conditions" requires that the three modifiers be construed

consistently with each other under the well-established maxim of noscitur a sociis. Under this maxim, "when general and specific words are grouped, the general words are limited by the specific and will be construed to embrace only objects similar in nature to those things identified by the specific words." Martin v. Commonwealth, 224 Va. 298, 302, 295 S.E.2d 890, 893 (1982). Or, as stated by another authority, "[t]he meaning of a word is or may be known from the accompanying words. Under the doctrine of 'noscitur a sociis', the meaning of questionable or doubtful words or phrases . . . may be ascertained by reference to the meaning of other words or phrases associated with it." Black's Law Dictionary 1060 (6th ed. 1990).

And, as pertinent to the prevention of "the development of any unclean, unsightly or unkept conditions of buildings or grounds," "unclean" is defined as "dirty, filthy," Webster's New International Dictionary 2485 (3rd ed. 1986) and "unkept" is defined as "neglected." Id. at 2502. Accordingly, I do not think that one can define "unsightly," in the context of these restrictions, as an "aesthetically displeasing" display.

In sum, and consistent with Friedberg and Williams, I read the word "unsightly" in harmony with the remaining language of restrictions 1 and 6. Thus, I would construe restriction 6 as dealing solely with a lot owner's responsibility to keep his buildings and grounds in good condition. And the evidence is uncontradicted that Bowman was doing so.

Finally, I do not agree with the association's contention that restriction 6, considered in context with all the other

restrictive covenants, "carr[ies] a certain meaning by definite and necessary implication," Friedberg, 218 Va. at 665, 239 S.E.2d at 110, that association approval is required for such a display of articles outside Bowman's house. Indeed, a review of the other restrictive covenants indicates otherwise.

When the author of the restrictive covenants intended to restrict a lot owner's use of the lot itself, specific language was employed to require that (1) the association approve building, plot, landscaping, and pollution control plans, as noted above, (2) lot owners not park or maintain any "vehicle of any type other than conventional automobiles, jeeps and pickup trucks" on their lots, (3) "[t]opographic and vegetation characteristics of properties within Wintergreen shall not be altered by removal, reduction, cutting, excavation or any other means without the prior written approval of the [association]," (4) "[n]o trees, shrubs or other vegetation may be removed without the written approval of the [association]," (5) individual landscaping plans of lots adjacent to the golf fairway and the ski slopes "shall be in general conformity with the overall landscaping pattern" for the golf course and ski slopes and subject to association approval.

Applying the familiar maxim expressio unius est exclusio alterius articulated in Turner v. Wexler, 244 Va. 124, 127, 418 S.E.2d 886, 887 (1992), I think that the enumeration of the instances of association approval of a lot owner's use of the lot excludes any implication that association approval is required for the display of unattached personal property outside of its

buildings or structures.  Therefore, I infer that if the developer had intended to impose this restriction upon the lot owners, it would have been specific in doing so, just as it had been in these other instances.

Accordingly, I would enter a final judgment affirming those parts of the final judgment that required association approval of the neon signs and the articles attached to the building and reversing those parts that required Bowman to remove the specified items of personal property from his deck and yard.

This order shall be certified to the said circuit court and shall be published in the Virginia Reports.

A Copy,

Teste:

David B. Beach,
Clerk