Present: Carrico, C.J., Compton, Lacy, Hassell, Keenan, and Koontz, JJ., and Poff, Senior Justice

DAVID ANDERSON, ET AL.

v. Record No. 961284

OPINION BY JUSTICE LAWRENCE L. KOONTZ,
FEBRUARY 28, 1997

LAKE ARROWHEAD CIVIC
 ASSOCIATION, INC.

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
James W. Haley, Jr., Judge

In this appeal, we consider whether an annual maintenance fee assessed upon property owners of a subdivision under a covenant recorded with the subdivision plats is subject to increase by the community association which maintains the common areas of the subdivision. The community association asserts that it has such authority either by operation of the Property Owners' Association Act (POAA), Code §§ 55-508 through -516.2,[1] or under the common law of easements.

BACKGROUND

The parties stipulated to the essential facts in the trial court. The Lake Arrowhead Subdivision in Stafford County was established through the recording of plats for the subdivision's various sections by the developer, H. Ryland Heflin and his wife, Lucille W. Heflin (collectively, Heflin), between 1961 and 1962. The plats included the reservation of easements for the individual lots over the roads and to the other common areas of the subdivision. Each recorded plat was subject to identical restrictive covenants which were recorded by deeds of dedication

---

[1]The POAA was amended in 1991 and 1992. These and subsequent amendments to the Act do not alter our resolution of the issues raised here.

in the land records of Stafford County at the same times as the plats of the sections.  When Heflin conveyed his interest in an individual lot to a purchaser, the deed referenced both the easements contained in the plat of the section in which the lot was located and the covenants associated with that plat.

Relevant to this appeal are covenants 12, 13, and 16. Covenant 12 granted to Heflin the power to assign "all of the rights and powers, title, easements and estates reserved" to him, provided that the assignee would have the same "obligations and duties with respect to the land area concerned."  Covenant 13 required each purchaser of a lot within the subdivision to pay Heflin or his assignee annually $20 for the first lot owned and $10 for each additional lot owned "to be used for general maintenance."  Covenant 13 further provided that the "maintenance fee shall be a lien on the real estate."  Neither this nor any of the other covenants expressly required Heflin, or his assignee, to actually maintain the common areas of the subdivision.

> Covenant 16 reads in full:
> All of the above covenants shall remain in force until January 1, 1970, and may be renewed for each 10 year period thereafter by the owners of at least two-thirds of the lots in the subdivision known as Lake Arrowhead, except that covenant number 13 shall be binding in perpetuity.

Lake Arrowhead Civic Association, Inc. (LACA), a Virginia nonstock corporation, was incorporated on December 16, 1970.  The articles of incorporation provided that LACA's purpose was "[t]o further and promote the community welfare of the property owners in the Lake Arrowhead Subdivision . . . and to handle and

supervise any funds _received_ for community betterment."

(Emphasis added.)  A subsequent amendment added a new article

requiring that "[e]ach owner of any lot by acceptance of a deed

therefore, whether or not it shall be expressed in any such deed

or other conveyance, . . . [shall] covenant and agree to pay

[LACA]: 1) annual assessments or fees and, 2) special assessments

for capital expenditures."

By deed dated January 20, 1978, Heflin conveyed to LACA

various parcels of land consisting primarily of the roads, lakes,

beaches, and park areas within the subdivision.[2]  The deed

purports to convey these parcels, the common areas of the

subdivision, "subject to all encumbrances, easements, covenants,

restrictions and rights-of-way of record" and expressly transfers

to LACA the power of "collection of maintenance fees."  However,

nothing in the language of this deed imposes any duty on LACA to

maintain the common area.

In a separate deed, also dated January 20, 1978, and

recorded contemporaneously in the land records with the deed

conveying the common areas, Heflin and LACA purported to renew

the covenants associated with the subdivision which would have

expired under their terms on January 1, 1970.  This deed recites

that the "covenants were renewed by vote of the then owners of at

least two-thirds of the lots in Lake Arrowhead Subdivision prior

to January 1, 1970."  It further recites that "through oversight,

no memorandum of renewal of such covenants was ever recorded

_____

[2]Heflin retained for himself other parcels within the
subdivision, including an island in one of the lakes.

among the land records."

Since at least 1986, LACA has imposed upon the property owners an annual assessment for general maintenance and upkeep of the common areas of the subdivision in amounts ranging from $88 to $123 per first lot owned in the subdivision. In 1992, LACA filed a bill of complaint to enforce liens against the lots of those property owners who were delinquent in paying their 1991 assessments. LACA's 1991 assessment per first lot was $98. From the dollar amounts of the delinquencies alleged in the bill of complaint, it appears that some property owners refused to pay the assessment in its entirety, while others paid $20, leaving an alleged delinquency of $78. The bill of complaint further reflects that property owners with multiple lots were assessed only $10 for each additional lot owned as contemplated by covenant 13. Again, it appears that some owners of more than one lot elected to pay $20 plus the additional $10 per additional lot assessed, leaving an alleged delinquency of $78.

In 1995, while the 1992 suit was still pending, LACA filed a second bill of complaint seeking to enforce liens against property owners who had incurred additional delinquencies in the interim. As with the 1991 assessments, it appears from the bill of complaint that some property owners elected to pay the assessment due under covenant 13, while others were alleged to be delinquent for the full amount assessed by LACA. Both the 1992 and the 1995 bills of complaint assert that the assessments were made "pursuant to valid authority and in accordance with the restrictions and covenants of the subdivision and the provisions

of Virginia law, and [LACA's] own by-laws . . . for the purpose of maintenance of the common areas and common facilities." Neither bill of complaint specifically makes reference to the POAA.

The property owners filed cross-bills in each suit seeking a declaration that the 1978 deeds renewing the covenants and conveying ownership of the common areas to LACA were both void. On that basis, the property owners asserted that LACA was without authority to make any assessments and was liable for any amounts collected under the guise of such authority.

The trial court consolidated the two suits, received briefs, and heard oral argument. After determining that LACA qualified under the provisions of the POAA to assess such sums upon the property owners in the subdivision as were reasonably necessary for the maintenance and upkeep of the common areas and, in addition, that LACA had that authority under the common law of easements, the trial court granted judgment for LACA. We awarded the property owners this appeal.

DISCUSSION

1. The 1978 Deeds

We begin our analysis in this appeal by determining the effect of the two 1978 deeds between Heflin and LACA. These deeds, in combination with the recorded covenants, are central to the parties' assertions in support of their conflicting positions. The essence of the disagreement is whether in 1978 Heflin could effectively transfer to LACA the ownership of the common areas, and if so, which of the restrictive covenants

remained in force at the time of that transfer and thereafter.

We are guided by well-established principles that restrictive covenants are not favored and must be strictly construed. <u>Mid-State Equipment Co. v. Bell</u>, 217 Va. 133, 140, 225 S.E.2d 877, 884 (1976). Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property. <u>Friedberg v. Riverpoint Bldg. Comm.</u>, 218 Va. 659, 665, 239 S.E.2d 106, 110 (1977).

By its express terms, covenant 16 operated to terminate covenants 1 through 12, 14, and 15 on January 1, 1970, unless those covenants were renewed for each subsequent ten-year period by the owners of at least two-thirds of the lots in the subdivision. Although the deed of renewal avers that such action was taken to effect that renewal for the first ten-year period, nothing in the land records prior to January 1, 1970, supports that averment.[3] LACA was not incorporated until more than eleven months after these covenants expired; thus, it could not have been the proper organization to conduct the alleged vote. Similarly, it was merely self-serving for LACA to assert that it was the proper party to represent the property owners on the subsequent deed purporting to renew the covenants.

On these facts, we hold that the failure to record the renewal of these covenants in the land records prior to their expiration, even if "through oversight," was fatal to any attempt

---

[3]The record does not show whether the covenants were again purportedly renewed in the subsequent ten-year periods beginning January 1, 1980 and January 1, 1990, as would have been required under the terms of covenant 16.

to revive these covenants thereafter.  Certainly, no property owners who acquired their interests between January 1, 1970, and the date the deed of renewal was recorded would be subject to the expired covenants.  Additionally, absent some affirmative evidence of the alleged vote and how it was conducted, there is no basis for continuing the covenants against the property owners who acquired their interests prior to the expiration of the covenants.  Any other result would run contrary to the presumption in favor of the right to free alienation of land and the strict construction of covenants that would limit that right. Lipps v. First American Serv. Corp., 223 Va. 131, 135, 286 S.E.2d 215, 218 (1982); Hutchinson v. Maxwell, 100 Va. 169, 175, 40 S.E. 655, 657 (1902).

There is no merit, however, to the property owners' further assertion that the deed conveying ownership of the common areas to LACA is void because covenant 12, concerning Heflin's power to assign or transfer his "rights and powers, title, easements and estates" to another party, expired on January 1, 1970, and was never effectively renewed.  Under a proper interpretation, covenant 12 was a restraint, reasonable in its scope, on Heflin's right to dispose of his property during and after the development of the subdivision.  Thus, the expiration of that covenant could not in any way restrict Heflin from disposing of his interest in the property.

2. Application of the POAA

Having concluded that LACA holds legal title to the common areas of the subdivision, we must now determine whether the

incidents of that ownership bring LACA within the operation of the POAA, supporting LACA's assertion that it has the power to levy assessments "for the maintenance and upkeep, including capital expenditures, of the common area," Code § 55-514, in addition to any fee permitted by covenant 13.

The POAA is applicable "to developments subject to a declaration initially recorded after January 1, 1959, and property owners' associations incorporated or otherwise organized after such date." Code § 55-508. The POAA defines a "[p]roperty owners' association" as "an incorporated or unincorporated entity upon which responsibilities are imposed and to which authority is granted in [a] declaration." Code § 55-509. As pertinent to this appeal, a "Declaration" is defined by the POAA as

> any instrument, however denominated, recorded among the
> land records of the county or city in which the
> development or any part thereof is located, that either
> (i) imposes on the association maintenance or
> operational responsibilities for the common area . . .
> [funded by] a regular annual assessment or (ii) creates
> the authority in the association to impose on lots, or
> on the owners or occupants of such lots . . . any
> mandatory payment of money . . . per year per lot as a
> regular annual assessment in connection with the
> provision of maintenance and/or services for the
> benefit of some or all of the lots, the owners or
> occupants of the lots, or the common area.

Id.[4]

Reading these two definitions together, it is clear that in order to qualify under the POAA, an association must possess both

_____

[4]Code § 55-508 includes a provision that a $150 minimum threshold for the annual assessment contained in the definition of "Declaration" would not be retroactively applied to declarations recorded prior to July 1, 1991. Accordingly, that threshold does not apply to the Lake Arrowhead Subdivision.

the power to collect a fixed assessment or to make variable assessments and a corresponding duty to maintain the common area. In addition, these conditions must be expressly stated in a recorded instrument in the land records of the jurisdiction where some portion of the development is located.

The language of the deed which conveyed the common areas from Heflin to LACA conveys to LACA the power to collect maintenance fees, but it does not expressly require LACA to maintain the common areas. The deed further subjects LACA to the "covenants . . . of record." At the time the deed was recorded, however, the only covenant remaining in force of potential benefit to LACA's assertion that it is subject to the POAA is covenant 13, binding in perpetuity through the provisions of covenant 16. Thus, only if we can construe the provisions of covenant 13 to impose a duty on LACA to maintain the common areas will LACA's argument for application of the POAA have merit.

By operation of covenant 13, when acquiring property in the subdivision, a property owner covenants to pay Heflin, or his assignee, specified fees "to be used for general maintenance." The ambiguity in this phrase is patent. By placing the obligation on the property owner, covenant 13 permits Heflin and any assignee to collect the fees, but does not require that the fees be collected. Nor does covenant 13 expressly require that maintenance of the common areas be undertaken. Rather, it merely places a condition on the power to collect the fees by limiting the permitted expenditure of the funds received to payment for general maintenance costs. Thus, while LACA possesses, by

operation of covenant 13, an adequate power of assessment to qualify under the POAA, there is no corresponding express duty imposed upon LACA to actually maintain the common areas.

It is not relevant that LACA may choose to exercise its power of assessment in order to expend the funds derived therefrom for maintenance of the common areas. The POAA applies only to associations upon which a mandatory duty to maintain is imposed. The Act has no application to an association, like LACA, which assumes such responsibilities voluntarily, even if the voluntary assumption is done as a condition of enforcing the property owners' covenant to pay fees for that purpose.

Accordingly, we hold that LACA does not meet the definition of a property owners' association found in the POAA. Absent qualification under the POAA, LACA's right to impose an assessment on the property owners, and to seek liens against the lots of property owners who are delinquent in paying that assessment, arises only from covenant 13. That covenant limits LACA to assessing annually no more than $20 against the first lot of a property owner and $10 for each additional lot. There is no mechanism in that covenant or otherwise provided by statute to increase this assessment.

### 3. Common Law of Easements

LACA asserts that even if it is not subject to the POAA, it can make assessments against the property owners as owners of dominant estates with a duty to maintain the easements over the servient estate owned by LACA. We disagree.

It is true that the owner of a dominant estate has a duty to

maintain an easement.  Pettus v. Keeling, 232 Va. 483, 490, 352 S.E.2d 321, 326 (1987);  Oney v. West Buena Vista Land Co., 104 Va. 580, 585, 52 S.E. 343, 344 (1905).  The owner of the dominant estate may fulfill this obligation by conducting the maintenance himself, or by voluntarily contributing to the maintenance costs of the owner of the servient estate.  Nothing in our case law suggests, however, that, absent a provision in the instrument creating the easement or a contract between the parties, the owner of the servient estate can impose a mandatory contribution to maintenance costs against the owners of the dominant estates.  Accordingly, we hold that LACA cannot enforce an assessment, in excess of that provided for in covenant 13, under the common law of easements.

In summary, LACA is not a property owners' association as defined by the POAA, but merely an assignee of Heflin which chooses to function as a voluntary community association.  As such, it can continue to collect the assessment permitted under covenant 13 provided that it expends those fees for no other purpose than general maintenance.  To the extent that a property owner is delinquent in this assessment, LACA may obtain a lien against the property owner's lot or lots.[5]

For these reasons, the judgment of the trial court will be

---

[5]We recognize that as a result of our decision, the property owners may have effectively "won the battle but lost the war," as the limited maintenance fee provided by covenant 13 may well be inadequate to maintain the common areas of this subdivision. However, the parties are certainly free to act to their mutual benefit with voluntary dues or other forms of assistance for the purpose of maintaining these areas.

reversed and the case remanded for a determination of which, if any, of the liens sought in the bills of complaint can be maintained and enforced to the extent allowed under covenant 13.

<u>Reversed and remanded</u>.