Present: Lemons, C.J., Goodwyn, McClanahan, Powell, Kelsey, and Roush, JJ., and Lacy, S.J.

WETLANDS AMERICA TRUST, INC.,

v. Record No. 141577

OPINION BY
JUSTICE ELIZABETH A. McCLANAHAN
February 12, 2016

WHITE CLOUD NINE VENTURES, L.P.

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Burke J. McCahill, Judge

Wetlands America Trust, Inc. ("WAT") holds a conservation easement on property in Loudoun County owned by White Cloud Nine Ventures, L.P. ("White Cloud"). On appeal, WAT contends the circuit court erred in rejecting claims in its declaratory judgment action that White Cloud's construction activities on the property and intended commercial uses for its newly-constructed facility violate the easement. We affirm the judgment of the circuit court.

## I. BACKGROUND

WAT is a non-profit organization that holds conservation easements across the country and provides fiduciary support to Ducks Unlimited, a non-profit wetlands and waterfowl conservation organization. In 2001, Caeli Farms, LLC, which owned a farm in Loudoun County consisting of approximately 400 acres, gave WAT a "Deed of Gift of Conservation Easement" (the "Easement") covering this property. Caeli Farms, LLC subsequently subdivided the farm into two tracts of approximately equal size and sold one of the tracts to White Cloud (the "Caeli property") in 2008. At that time, White Cloud already owned adjacent property leased to Chrysalis Vineyards, LLC ("Chrysalis") consisting of approximately 50 acres on which Chrysalis was operating a vineyard and winery (the "Chrysalis property"). The same individual, Jennifer McCloud, was then and has continued to be the general partner of White Cloud and the managing and only member of Chrysalis.

White Cloud purchased the Caeli property with the intention of leasing it to Chrysalis to use for expanding the Chrysalis vineyard, grazing milk cows to be milked on the Chrysalis property, and raising wheat. White Cloud further planned to construct a building on the Caeli property in which Chrysalis would operate a creamery and bakery, using the milk and wheat derived from the Caeli property. The building would also be used to store barrels of aging wine made from grapes grown on both the Caeli and Chrysalis properties. In addition, the building would include a tasting room and would be open to the general public for the sampling and sale of the Chrysalis wine and the Chrysalis cheese and bakery products produced on site. Acting on these plans, White Cloud commenced construction of the building on the Caeli property, along with an adjoining parking lot, a new road leading to the parking lot, and a new bridge.

WAT filed the present action in the Loudoun County Circuit Court seeking a declaratory judgment that White Cloud's construction activities and intended commercial use of the new facility on the Caeli property violated the Easement's restrictive covenants. WAT further requested an order enjoining White Cloud from continuing its construction activities and requiring it to restore the Caeli property to its pre-construction condition. In its answer, White Cloud denied violating the Easement and asserted as affirmative defenses, inter alia, that the Easement was unenforceable because it was impermissibly vague and ambiguous, and that WAT's claims were barred by estoppel and laches.

During a five-day bench trial, WAT sought to establish that White Cloud had committed 14 separate violations of the Easement. The evidence at trial included expert testimony from both sides on issues pertaining to a number of the alleged violations. One such issue, as relevant to this appeal, pertained to the impact of White Cloud's subject activities on the Caeli property's habitat for which the parties offered the testimony of competing experts in the field of biology.

2

Another such issue involved the erodibility of the soil at the construction site for the new building and parking area for which the parties offered the testimony of competing experts in the field of soil science.

After taking evidence and analyzing the terms of the Easement, the trial court issued a 30-page letter opinion setting forth rulings in White Cloud's favor, with narrow exception.[1]  In a motion for reconsideration, WAT argued, among other things, that the trial court erred in construing the Easement by applying the common law principle that restrictive covenants are to be strictly construed in favor of the free use of land.  See Waynesboro Village, LLC v. BMC Props., 255 Va. 75, 80, 496 S.E.2d 64, 67-68 (1998) (reciting principle and cited in trial court's letter opinion).  The trial court denied WAT's motion and entered a final order incorporating the findings and conclusions in its letter opinion.

On appeal, WAT asserts in its assignments of error that the trial court erred by: (1) applying the common law strict construction principle for restrictive covenants to a conservation easement; (2) ruling that the term "farm building" in Section 3.3(A)(iv) of the Easement was ambiguous and that White Cloud's disputed building was a permitted farm building under the Easement; (3) ruling that the prohibition under Section 3.3(C)(vi) of the Easement against constructing a building on a "highly erodible area" was ambiguous and that the erodibility was to be tested after the construction site had been graded; (4) ruling that the alteration of the topography for the parking lot was "required" and did not require WAT's permission under Section 3.6; (5) ruling that the stated purposes of the Easement set forth in Section 1.1 in regard to retaining the predominant condition of the property and preventing significant impairment of

---

[1] The only issues included in this appeal on which the trial court ruled adversely to White Cloud are those contained in White Cloud's assignments of cross-error challenging the trial court's rulings on its three affirmative defenses identified above.  Because we affirm the trial court's judgment, we need not address those issues.

the Easement's conservation values were ambiguous and misapplying these stated purposes; and

(6) refusing to consider WAT's claim that White Cloud's construction of the new bridge violated

the Easement because WAT did not allege the claim in its complaint.

## II.  ANALYSIS

### A.  Standard of Review, Principles of Construction and Burden of Proof

Well-settled principles guide our review of the trial court's judgment.  "As to purely

factual determinations made by the trial court, we will not disturb those findings unless they are

plainly wrong or without evidence to support them."  Perel v. Brannan, 267 Va. 691, 698, 594

S.E.2d 899, 903 (2004).  In reviewing those findings, we view the evidence "in the light most

favorable to the prevailing parties."  Carter v. Carter, 223 Va. 505, 509, 291 S.E.2d 218, 220

(1982).  However, like other contracts, we review a trial court's construction of a deed of

easement de novo.  Marble Technologies, Inc. v. Mallon, 290 Va. 27, 33, 773 S.E.2d 155, 158

(2015).[2]  See Langman v. Alumni Ass'n of the Univ. of Va., 247 Va. 491, 498, 442 S.E.2d 669,

674 (1994) ("The question whether a writing is ambiguous is not one of fact but of law.").

Our function in construing a deed is to give effect to the parties' intention as expressed by

them in the words they have used.  Camp v. Camp, 220 Va. 595, 597-98, 260 S.E.2d 243, 245

(1979).  "'Where the language of [the] deed clearly and unambiguously expresses the intention

of the parties, no rules of construction should be used to defeat that intention.'"  Swords Creek

Land P'ship v. Belcher, 288 Va. 206, 212, 762 S.E.2d 570, 572 (2014) (quoting CNX Gas Co. v.

Rasnake, 287 Va. 163, 166-67, 752 S.E.2d 865, 867 (2014)).  We normally give the words used

---

[2] See, e.g., Squire v. Virginia Housing Dev. Auth., 287 Va. 507, 516, 758 S.E.2d 55, 60 (2014) (explaining that "[a] deed of trust is construed as a contract under Virginia law" (quoting Mathews v. PHH Mortgage Corp., 283 Va. 723, 733, 724 S.E.2d 196, 200-01 (2012) (citation and internal quotation marks omitted)).

by the parties "'their usual, ordinary, and popular meaning. No word or clause in the [deed] will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.'" Squire v. Virginia Housing Dev. Auth., 287 Va. 507, 516, 758 S.E.2d 55, 60 (2014) (quoting Uniwest Constr., Inc. v. Amtech Elevator Servs., 280 Va. 428, 440, 699 S.E.2d 223, 229 (2010)). See Minner v. Lynchburg, 204 Va. 180, 189, 129 S.E.2d 673, 679 (1963) ("Every word [in a deed], if possible, is to have effect." (citation and internal quotation marks omitted)).

At the same time, "[e]ffect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or meaningless." CNX Gas Co., 287 Va. at 168, 752 S.E.2d at 867 (citing Auerbach v. County of Hanover, 252 Va. 410, 414, 478 S.E.2d 100, 102 (1996); Foster v. Foster, 153 Va. 636, 645, 151 S.E. 157, 160 (1930)). This means that "the whole of a deed and all its parts should be considered together" in order to determine the controlling intent. Id. (citing Auerbach, 252 Va. at 414, 478 S.E.2d at 102; see Hinton v. Hinton, 209 Va. 544, 545-46, 165 S.E.2d 386, 387 (1969) (Each part of a deed "'must be construed with reference to the whole, so as to make it harmonious and sensible as a whole.'" (quoting Willis v. Kalmbach, 109 Va. 475, 482, 64 S.E. 342, 345 (1909))))).

When the deed, so construed, is plain and unambiguous, we are "'not at liberty to search for its meaning beyond the instrument itself.'" Virginia Elec. & Power Co. v. Northern Va. Reg'l Park Auth., 270 Va. 309, 316, 618 S.E.2d 323, 326 (2005) (quoting Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983)). An instrument will be deemed unambiguous if its provisions are "capable of only one reasonable construction." Clinch Valley Physicians, Inc. v. Garcia, 243 Va. 286, 289, 414 S.E.2d 599, 601 (1992) (citation and internal quotation marks omitted). Conversely, a deed will be deemed ambiguous, and thus require judicial interpretation,

5

if its "'language admits of being understood in more than one way or refers to two or more things at the same time.'" Amos v. Coffey, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984) (quoting Renner Plumbing v. Renner, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983)).

Specifically in regard to restrictive covenants imposing encumbrances on land, under the common law, if such restrictions in a deed or other written instrument suffer from any "[s]ubstantial doubt or ambiguity" they are strictly construed against the party seeking to enforce them. Friedberg v. Riverpoint Bldg. Comm., 218 Va. 659, 665, 239 S.E.2d 106, 110 (1977) (citing Schwarzschild v. Welborne, 186 Va. 1052, 1058, 45 S.E.2d 152, 155 (1947)). As indicated above, however, WAT challenges in the first recited assignment of error the trial court's application of this principle to the Easement, which we address in Part II.B. infra.

Still, when a court has resolved the meaning of such disputed restrictive covenants, the restrictions will be enforced "when applicable." Mid-State Equip. Co. v. Bell, 217 Va. 133, 140, 225 S.E.2d 877, 884 (1976); see Perel, 267 Va. at 699-700, 594 S.E.2d at 904. But the plaintiff, in seeking enforcement of the restrictions, has the burden to prove that they have been "violated by the acts of the defendant." Id. at 700, 594 S.E.2d at 904 (citing Hening v. Maynard, 227 Va. 113, 117, 313 S.E. 2d 379, 381 (1984); Forbes v. Schaefer, 226 Va. 391, 400, 310 S.E. 2d 457, 463 (1983)). The risk of non-persuasion thus remains with the plaintiff. See Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 5-1[c], at 299 (7th ed. 2012) ("This is the burden of convincing the trier of fact that a particular result should be reached. . . . [I]f the party who has this 'burden of persuasion' fails to carry it, [this party] will lose the case.").

B.  Applicability of Strict Construction Principle

WAT argues that all of the disputed restrictive covenants contained in the Easement are clear and unambiguous, and that the trial court thus erred in determining that the restrictions are

6

ambiguous, leading the trial court to then render its allegedly erroneous interpretation and application of them. Alternatively, WAT argues that, assuming arguendo the Easement restrictions are ambiguous, the trial court erred when it applied to this conservation easement the common law strict construction principle applicable to restrictive covenants whereby "the trial court construed all purported ambiguities against WAT and in favor of White Cloud."

We disagree with WAT as to each of these arguments, finding no error in the trial court's rulings that the disputed restrictions contained in the Easement are (a) ambiguous, thus requiring judicial interpretation, as addressed in Parts II.C. through F. infra., and (b) subject to the common law strict construction principle for restrictive covenants triggered by ambiguity.

Under this common law principle, consistently recognized and applied by this Court for over a century, "[v]alid covenants restricting the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains." Friedberg, 218 Va. at 665, 239 S.E.2d at 110 (citing Riordan v. Hale, 215 Va. 638, 641, 212 S.E.2d 65, 67 (1975); Traylor v. Halloway, 206 Va. 257, 259, 142 S.E.2d 521, 522-23 (1965)). Accordingly, "[s]ubstantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property." Id. (citing Schwarzschild, 186 Va. at 1058, 45 S.E.2d at 155); see Stevenson v. Spivey, 132 Va. 115, 119, 110 S.E.367, 368 (1922) (restrictive covenants "will not be aided or extended by implication").[3]

---

[3] See also, e.g., Fein v. Payandeh, 284 Va. 599, 606, 734 S.E.2d 655, 659 (2012); Lovelace v. Orange County Bd. of Zoning Appeals, 276 Va. 155, 159, 661 S.E.2d 831, 833 (2008); Scott v. Walker, 274 Va. 209, 212-13, 645 S.E.2d 278, 280 (2007); Barris v. Keswick Homes, L.L.C., 268 Va. 67, 71, 597 S.E.2d 54, 57 (2004); River Heights Assocs. v. Batten, 267 Va. 262, 271, 591 S.E.2d 683, 688 (2004); Anderson v. Lake Arrowhead Civic Ass'n, 253 Va. 264, 269-70, 483 S.E.2d 209, 212 (1997); Woodward v. Morgan, 252 Va. 135, 138, 475 S.E.2d 808, 810 (1996); Waynesboro Village, LLC, 255 Va. at 80, 496 S.E.2d at 67-68; Williams v.

7

WAT asserts, however, that notwithstanding the long adherence to this common law principle in Virginia, the principle has been abrogated in relation to conservation easements in light of Virginia legislation favoring land conservation and in particular the Virginia Conservation Easement Act ("VCEA"), Code §§ 10.1-1009 through -1016, enacted in 1988. See United States v. Blackman, 270 Va. 68, 80-82, 613 S.E.2d 442, 447-49 (2005) (analyzing the VCEA).

There is no dispute that a conservation easement authorized under the VCEA,[4] which encompasses the present Easement, "is not of a character that has been recognized traditionally at common law" as the VCEA expressly states. Code §10.1-1014. It is primarily the VCEA's approval of a conservation easement containing "in gross"[5] and restriction components (i.e., an

_____

Brooks, 238 Va. 224, 228, 383 S.E.2d 712, 714 (1989); Forbes v. Schaefer, 226 Va. 391, 400-01, 310 S.E.2d 457, 463 (1983); Foley v. Harris, 223 Va. 20, 26, 286 S.E.2d 186, 189 (1982); Mid-State Equip. Co., 217 Va. at 140, 225 S.E.2d at 884; Town of Vinton v. City of Roanoke, 195 Va. 881, 893, 80 S.E.2d 608, 615 (1954); Jernigan v. Capps, 187 Va. 73, 78, 45 S.E. 886, 889 (1948); Virginian Ry. Co. v. Avis, 124 Va. 711, 718-19, 98 S.E. 638, 640 (1919); King v. N. & W. Ry. Co., 99 Va. 625, 628-29, 39 S.E. 701, 702-03 (1901).

[4]A "conservation easement" is defined in the VCEA as

a nonpossessory interest of a holder in real property, whether easement appurtenant or in gross, acquired through gift, purchase, devise, or bequest imposing limitations or affirmative obligations, the purposes of which include retaining or protecting natural or open-space values of real property, assuring its availability for agricultural, forestal, recreational, or open-space use, protecting natural resources, maintaining or enhancing air or water quality, or preserving the historical, architectural or archaeological aspects of real property.

Code § 10.1-1009.

[5] As stated in Blackman:

Easements, whether affirmative or negative, are classified as either "appurtenant" or "in gross." An easement appurtenant, also known as a pure easement, has both a dominant and a servient tract and is capable of being transferred or inherited. It frequently is said that an easement appurtenant "runs

8

easement not appurtenant to any real property that "impos[es] limitations" on the encumbered land), Code § 10.1-1009, coupled with a "perpetual" duration, Code § 10.1-1010(C), that places the conservation easement at odds with the common law.  See generally 4 Richard R. Powell, Powell on Real Property § 34A.01 (Michael Allen Wolf ed., 2015) (analyzing conservation easements in relation to the common law of servitudes).  A conservation easement is nevertheless appropriately viewed as a form of "restrictive covenant or negative easement" on the land it encumbers.  Id.; see also Andrew Dana & Michael Ramsey, Conservation Easements and the Common Law, 8 Stan. Envtl. L.J. 2, 12-16 (1989) (comparing conservation easements to common law easements and restrictive covenants).

We thus agree with WAT that in certain significant respects the VCEA is in derogation of the common law.  However, our analysis does not end there, as this does not necessarily mean that the common law strict construction principle applied to restrictive covenants is abrogated by the VCEA.  Under settled principles of statutory construction, "'[s]tatutes in derogation of the common law are [themselves] to be strictly construed and not to be enlarged in their operation by construction beyond their express terms.'"  Isbell v. Commercial Inv. Assocs., Inc., 273 Va. 605, 613, 644 S.E.2d 72, 75 (2007) (quoting Chesapeake & Ohio Ry. Co. v. Kinzer, 206 Va. 175, 181, 142 S.E.2d 514, 518 (1965)).  Accordingly, "'[w]hen an enactment does not encompass the entire subject covered by the common law, it abrogates the common-law rule only to the extent

> with the land," which is to say that the benefit conveyed by or the duty owed under the easement passes with the ownership of the land to which it is appurtenant. . . .
>     In contrast, an easement in gross, sometimes called a personal easement, is an easement which is not appurtenant to any estate in land, but in which the servitude is imposed upon land with the benefit thereof running to an individual.

270 Va. at 77, 613 S.E.2d at 446 (citations and some internal quotation marks omitted).

9

that its terms are directly and irreconcilably opposed to the rule.'" Id. at 613-14, 644 S.E.2d at 75 (quoting Boyd v. Commonwealth, 236 Va. 346, 349, 374 S.E.2d 301, 302 (1988)).

The VCEA, of course, does not encompass the entire subject of common law easements and restrictive covenants. Furthermore, the common law strict construction principle applied to restrictive covenants is exactly that — a contract construction principle. Nowhere does the VCEA specifically address the principles of contract construction to be applied to conservation easements approved under this statutory scheme, and thus it does not abrogate such principles with direct and irreconcilable opposition.[6] Indeed, the VCEA sets forth absolutely no provisions that could remotely be viewed as inconsistent with such principles while in fact indicating its approval of them. Code § 10.1-1014 of the VCEA expressly states : "Except as otherwise provided in this chapter, a conservation easement may be created, conveyed, recorded, assigned, released, modified, terminated, or otherwise altered or affected in the same manner as other easements." (Emphasis added.) Finally, by leaving the strict construction principle in force with the passage of the VCEA, the legislature must have viewed this principle as an appropriate additional incentive for those who draft the conservation easements to achieve clarity in light of the fact that they are subject to enforcement in perpetuity.

We thus conclude that the VCEA does not abrogate the common law strict construction principle as the VCEA is not "directly and irreconcilably opposed" to it. Isbell, 273 Va. at 613-14, 644 S.E.2d at 75. Accordingly, as dictated by the governing statutory construction

---

[6] This is equally true of Article XI, §§ 1 and 2, of the Virginia Constitution (stating policy of the Commonwealth to protect the environment and authorizing the legislature to undertake measures to do so), the Open-Space Land Act, Code §§ 10.1-1700 through -1705, the Virginia Outdoors Foundation, Code §§ 10.1-1800 through -1804, and the Virginia Land Conservation Incentives Act of 1999, Code §§ 58.1-510 through -513, all of which WAT also relies upon in challenging the application of the common law strict construction principle to the Easement. That is to say, like the VCEA, none of these provisions address in any way the interpretive principles to be applied to a conservation easement.

10

principles, the restrictive covenants in the Easement that we determine to be ambiguous must be strictly construed against restriction and in favor of White Cloud.[7]

### C. "Farm Building" under Section 3.3(A)(iv) of the Easement

We now turn first to WAT's argument that the trial court erred in ruling that the term "farm buildings" in Section 3.3(A)(iv) of the Easement was ambiguous, and that White Cloud's newly-constructed building was a permitted farm building under the trial court's interpretation of the Easement. Section 3.3(A)(iv) states: "No permanent or temporary building or structure shall be built or maintained on the entirety of the Protected Property other than . . . farm buildings or structures . . . ." Neither the term "farm buildings" nor the term "farm structures" is defined by

---

[7] In opposing this conclusion, the dissent points to another principle of construction providing that ambiguous language in a deed must be construed against the grantor and in favor of the grantee, citing CNX Gas Co., 287 Va. at 167-78, 752 S.E.2d at 867. However, the dissent does not cite any case, nor is there one, where this Court has given that principle precedence over the strict construction principle applied to restrictive covenants when the latter principle was implicated in a dispute over the meaning of certain restrictive covenants in a deed. See, e.g., Barris, 268 Va. at 69-71, 597 S.E.2d at 55-57; Anderson, 253 Va. at 267-70, 483 S.E.2d at 210-12; Woodward, 252 Va. at 136-38, 475 S.E.2d at 809-10; Forbes, 226 Va. at 393-401, 310 S.E.2d at 459-63; Foley, 223 Va. at 22-26, 286 S.E.2d at 187-90; Friedberg, 218 Va. at 660-65, 239 S.E.2d at 107-10; Schwarzschild, 186 Va. at 1053-58, 45 S.E.2d at 152-55; Stevenson, 132 Va. at 117-20, 110 S.E. at 367-68.

We note that the above-stated interpretive principle relied upon by the dissent usually arises, as it did in CNX Gas Co., where there is a dispute, not over the meaning of restrictions placed on the use of certain land, but rather over "the nature and extent of the estate the grantor intended to convey." CNX Gas Co., 287 Va. at 168, 752 S.E.2d at 867. Thus, for example, "where there is doubt whether one or two parcels of land were intended to be conveyed, the deed will be construed to pass title to both." Id. at 168, 752 S.E.2d at 868 (citations omitted). The specific question in CNX Gas Co. was whether "the deed convey[ed] to the grantee in fee simple all of the mineral interests in the land embraced within the deed's metes and bounds description that the grantors were capable of conveying at the time, excluding only the coal, which they no longer owned," and this Court held in the affirmative upon construing the deed in favor of the grantee. Id.

11

the Easement. Section 3.3(D), however, refers to the structures listed in Section 3.3(A), including farm buildings, as "agricultural buildings."

Virginia's Uniform Statewide Building Code defines the term "[f]arm building or structure," in relevant part, as "a building or structure . . . located on property where farming operations take place, and used primarily for any of the following uses or combination thereof: 1. Storage, handling, production, display, sampling or sale of agricultural, horticultural, floricultural or silvicultural products produced in the farm; 2. Sheltering, raising, handling, processing or sale of agricultural animals or agricultural animal products . . . ." Code § 36-97. This statutory definition is not binding in this case; but that is also true of dictionary definitions, which courts often consult in cases such as this one. We simply regard both to be appropriate sources for consideration in determining the proper meaning of "farm building," or its synonym "agricultural building," in the context of the Easement as a whole, where these terms are undefined.

Webster's Third New International Dictionary does not define "farm building" or "agricultural building," but does provide the following related definitions which are instructive. The word "farm" is defined as "any tract of land whether consisting of one or more parcels devoted to agricultural purposes generally under the management of a tenant or the owner." Webster's Third New International Dictionary 824 (1993). "Agricultural" is defined as "of, relating to, or used in agriculture." Id. at 43. "Agriculture" is then defined as "the science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing)." Id. at 44.

With the incorporation of production, preparation and marketing as components of agricultural activities, these dictionary definitions are consistent with the above-stated definition

12

of "farm building" under Code § 36-97, all of which support the inclusion of these components in our construction of the term "farm building" in Section 3.3(A)(iv) of the Easement. We also find strong support for such interpretation in Section 3.1 of the Easement, which expressly authorizes "[i]ndustrial" and "commercial" agricultural activities. This can only reasonably mean that the farm/agricultural buildings permitted under Section 3.3(A)(iv) may be used for agricultural activities that are commercial and/or industrial in nature. Notably, WAT simply ignores these authorized activities under the Easement in advocating its own restrictive construction of the term "farm building." Section 4.1 of the Easement also supports our construction of the term "farm building" in providing that "changes in agricultural technologies, including accepted farm and forestry management practices may result in an evolution of agricultural activities on the Protected Property."

We thus conclude that White Cloud's intended use for its new building on the Caeli property falls within the range of activities qualifying as a "farm building" under Section 3(A)(iv). It would be unreasonable to conclude otherwise. Accordingly, we agree with the trial court that the building can be used to store and sell wine derived from grapes grown, at least in part, on the Caeli property; to process and sell cheese made from milk derived from cows that graze on the Caeli property; to make and sell bakery products from wheat grown on the Caeli property; and to market these products to the general public directly from the building, including space dedicated for customers to sample the products on site.

### D. "Highly Erodible Areas" under Section 3.3(C)(vi)

WAT next argues that the trial court erred by ruling that the prohibition under Section 3.3(C)(vi) of the Easement against constructing a building on "highly erodible areas" was ambiguous and that, under the trial court's interpretation of the Easement, the erodibility was to

13

be tested after the construction site for the new building had been graded. The trial court so interpreted the Easement after "reconcil[ing]" Section 3.3(C)(vi) with Section 3.6, which addresses White Cloud's right to grade on the Caeli property. Specifically, Section 3.3(C)(vi) states: "No building or structure of any nature may be constructed on the Protected Property . . . on any highly erodible areas as identified by the U.S. Department of Agriculture . . . ." Section 3.6, on the other hand, states in relevant part: "Grading, blasting or earth removal shall not materially alter the topography of the Protected Property except . . . as required in the construction of permitted buildings, as per Section 3.3 . . . ." Having interpreted these provisions as making post-grading the time for testing the site's erodibility, the trial court ruled that WAT failed to prove White Cloud violated Section 3.3(C)(vi) because WAT presented no evidence concerning the site's erodibility after it was graded.

We must give effect to every provision of the Easement, if possible, "so as to make it harmonious and sensible as a whole." Hinton, 209 Va. at 545-46, 165 S.E.2d at 387 (citation and internal quotation marks omitted). Under Section 3.6, White Cloud, as the landowner, has the express right to grade, blast and remove soil for the construction of permitted buildings. This right must be sensibly harmonized with the limitation in Section 3.3(C)(vi) that no building may be "constructed" on what are determined to be "highly erodible areas as identified by the U.S. Department of Agriculture" ("USDA").

It is reasonable to assume that the parties to the Easement, in choosing the Section 3.3(C)(vi) language, were aware of the essential purpose of the USDA mapping of highly erodible croplands. The mapping was performed pursuant to the USDA's authority under various provisions of the Food Security Act of 1985, 16 U.S.C. § 3801, et seq., and 7 C.F.R. §§ 12.1 through 12.13 and §§ 12.20 through 12.33. This statutory and regulatory scheme provides

14

measures and establishes programs designed to address the widespread problem of soil erosion on croplands across the country, which is primarily the result of the impact of wind and rain on farm fields cultivated for growing crops. See H.R. Rep. No. 99-271, at 77-91 (1985). Accordingly, the USDA mapping is not concerned with, and thus does not identify, the soil erodibility level of any specific site such as a construction site, as the trial court found in this case.

The parties to the Easement nevertheless incorporated this USDA mapping scheme into the terms of the Easement at Section 3.3(C)(vi) out of what was, no doubt, a desire to protect the Caeli property from significant soil erosion that might be caused by the construction of permitted buildings. At the same time, however, those same parties also authorized the landowner to grade, blast and remove soil for the construction of permitted buildings under Section 3.6. We thus believe it is only reasonable to conclude, as did the trial court in reconciling these provisions, that if the site for constructing a permitted building is not highly erodible after the grading for the site has been done, there is no violation of Section 3.3(C)(vi).

As to the evidence presented on this issue, there was no dispute that USDA mapping identified the Caeli property as containing highly erodible soil. In addition, WAT's expert witness provided detailed information regarding the criteria and calculations for determining soil erodibility under the USDA regulations. However, WAT's expert had never been to the Caeli property and had no information on the soil erodibility of the construction site for the new building after the site had been graded.[8] Nor did any other witness provide this information. In

---

[8] Though we hold that the relevant time for determining the soil erodibility under the Easement is post-grading, we note that the trial court found that White Cloud's soil expert went to the site of the new building before it was graded, augered several holes for testing the soil, and "found that the soil was well-drained and had good structure." This is an indication that this

15

the absence of any such evidence, the trial court correctly ruled that WAT failed to meet its burden of establishing a violation of Section 3.3(C)(vi) of the Easement.

E. Alteration of Topography for Parking Area under Section 3.6

We continue with our review of Section 3.6 of the Easement in addressing WAT's additional argument that the trial court erred in ruling that this provision was not violated by the grading done for White Cloud's parking area adjacent to the new building. This interpretation and application of Section 3.6 is sensible and correct. It would be completely incongruous and unreasonable to conclude that White Cloud has the authority under the Easement to grade the site for the new building and construct it as a "farm building" as that term is interpreted above — which includes the right to allow the general public to visit the building to sample and purchase products on site — and yet hold that White Cloud has no right under Section 3.6 to "alter the topography" by grading the site for an adjoining parking area.

WAT also challenges the trial court's rejection of its argument that White Cloud was required under Section 3.12 of the Easement to receive WAT's prior written approval before doing the grading for the parking area. Section 3.12, which is entitled "Water Resources," states in relevant part that "[t]he Grantor reserves the right to grade, move earth and otherwise alter the topography of the Protected Property, with the prior written approval of Grantee, which approval shall not unreasonably be withheld for dam construction and the creation of private ponds, lakes, and/or wetland areas. Such activity shall not impair the conservation values or the Purpose of the Easement." We agree with the trial court that this provision does not apply to grading related to permitted buildings, but rather is limited in very specific terms to the permission required for the construction of dams, ponds, lakes and wetland areas.

specific site was not, in fact, highly erodible before grading under the USDA criteria for making such a determination, despite what was indicated on the USDA mapping for the general area.

16

F.  Stated Purposes of the Easement under Section 1.1

We now consider WAT's challenge to the trial court's interpretation and application of the Easement's principal restrictions set forth in Section 1.1 in the context of the Easement's expressly stated purpose:  "It is the purpose of this Easement to assure that the Protected Property will be retained in perpetuity predominantly in its natural, scenic, and open condition, as evidenced by the [Baseline Document] Report [BDR], for conservation purposes as well as permitted agricultural pursuits, and to prevent any use of the Protected Property which will impair significantly or interfere with the conservation values of the Protected Property, its wildlife habitat, natural resources or associated ecosystem."

WAT argues that, even if the individual provisions of the Easement addressed above in Parts II.C., D. and E. have not been violated, the trial court erred in ruling that (a) White Cloud, in the construction and use of its new facilities, has retained the Caeli property in predominantly the condition required by Section 1.1, as construed in the context of the Easement as a whole; and (b) White Cloud has not thereby significantly impaired or interfered with the Easement's "conservation values" or the property's environment, as prohibited in Section 1.1.

First, WAT relies on the BDR to make its argument that White Cloud has not retained the property in the condition required under Section 1.1.  The BDR was a report prepared by an ecologist on the status of the Caeli property in 2001.  The parties to the Easement retained the ecologist to prepare the report concurrently with the drafting and execution of the Easement.[9] The BDR consists of a description of the property, its current and previous uses, and its

_____

[9] As stated in the BDR, its purpose was to "provide supporting documentation that the granting of the proposed easement constitutes a 'qualified conservation contribution' as defined under 26 U.S.C. § 170(h)(2)(c) of the Internal Revenue Code of 1986, as amended."

17

ecological character. The property's overall use as of 2001 was described therein as "consist[ing] of a mixture of agricultural (row crop production and cattle pastures), actively managed wildlife habitat areas, and mature deciduous hardwood forest." The "management" of the property as of that time was then described as "directed at responsible, low-impact agriculture and promotion of wildlife habitat."

WAT contends that Section 1.1 unambiguously requires that the property be retained in perpetuity in the condition identified in the BDR. "So if you come back to that property a hundred years from now," according to WAT, "it should look almost exactly like it looked in 2001 . . . as evidenced by the [BDR]." Thus, WAT asserts, "it cannot possibly be concluded that White Cloud's extensive facilities and activities 'retain' the [p]roperty in the condition identified in the BDR." We disagree.

Section 1.1 indeed makes plain that the BDR is to serve as a baseline for assessing whether the property is being predominately retained for "conservation purposes as well as permitted agricultural pursuits." While the Easement does not define the term "conservation purposes," it does, however, set forth a number of significant "permitted agricultural pursuits." As already addressed above in our analysis of the meaning of "farm building" under Section 3.3(A)(iv), the land owner's permitted agricultural pursuits on the property include, among others, the construction of new farm buildings used for not only commercial agricultural activities, but even industrial agricultural activities, which were clearly not activities conducted on the property in 2001. So while there may be inherent tension between the "conservation purposes" and the expressly "permitted agricultural pursuits," the Easement specifically demands retention of the property "for conservation purposes as well as permitted agricultural pursuits," and therefore the character of the property is in no way frozen in perpetuity "almost as it looked

18

in 2001." (Emphasis added.) Thus, the trial court did not err in ruling that, "under the Easement, White Cloud was not required to retain its property in the condition established by the [BDR] to the extent it has engaged in permitted uses."

Second, WAT argues that White Cloud's construction and use of its new facilities significantly impair or interfere with the Easement's "conservation values" and/or the property's environment, as prohibited under Section 1.1. It is the "total impact of White Cloud's activities," WAT contends, that has resulted in the violation of this restriction. Thus, WAT asserts, the trial court erred in denying this additional claim of an alleged violation of Section 1.1.

In rejecting this claim, the trial court stated in its letter opinion that it could not find "based on the evidence presented . . . that [White Cloud's] facilities and their uses are inconsistent with and significantly impair and interfere with the conservation values of the Easement and the wildlife habitat, natural resources, and associated ecosystems on the property" under Section 1.1. Initially, the trial court heard the testimony of Scott Yaich, a director of conservation planning and policy with Ducks Unlimited, who qualified as an expert witness for WAT in the field of wildlife habitat ecology and biology. Yaich testified that, based on his evaluation, White Cloud's construction activities on the Caeli property and projected plans would have a significant adverse impact to the property's wildlife resources. However, the trial court subsequently heard the testimony of White Cloud's expert witnesses, James Edward Irre and Avinash Sareen, who similarly qualified as experts in the field of biology. The trial court summarized these witnesses' testimony as follows:

> White Cloud offered Mr. Irre, a biologist, and he opined that there was no significant impact of the utility crossing, culvert, or road crossing. White Cloud also offered Mr. Sareen, a biologist, who opined that there were marginal effects from the improvements and that only a small percentage of the property was impacted. He noted that the land had already been altered by the agricultural and man-made wetlands and roads and that overall there was a de minimis effect.

19

The conflicting testimony among these three experts created a question of fact. As the trier of fact, the trial court was charged with determining the credibility of these witnesses and the weight of the evidence. See Johnson v. Commonwealth, 273 Va. 315, 323, 641 S.E.2d 480, 485 (2007); Grubb v. Grubb, 272 Va. 45, 54-55, 630 S.E.2d 746, 752 (2006); Schneider v. Commonwealth, 230 Va. 379, 383, 337 S.E.2d 735, 737 (1985). The trial court obviously credited the testimony of White Cloud's two experts over the testimony of WAT's expert in finding that White Cloud's construction and use of its new facilities did not significantly impair or interfere with the Easement's conservation values and/or the property's environment. As this expert testimony supports that finding, we will not disturb it on appeal.

G. Preclusion of WAT's Claim Regarding a Bridge under Section 3.3(C)(v)

Finally, WAT argues that the trial court erred when it refused to consider WAT's purported claim that White Cloud's construction of the new bridge on the Ceali property violated Section 3.3(C)(v) of the Easement (which prohibits buildings and other structures from being constructed within a certain distance from a perennial stream or pond or on certain floodplains). The trial court, citing Jenkins v. Bay House Associates, 266 Va. 39, 43, 581 S.E.2d 510, 512 (2003), so ruled because WAT did not allege in its complaint that the bridge violated the Easement.

It is well-settled under Virginia law that "'[a] litigant's pleadings are as essential as his proof, and a court may not award particular relief unless it is substantially in accord with the case asserted in those pleadings. Thus, a court is not permitted to enter a decree or judgment order based on facts not alleged or on a right not pleaded and claimed.'" Dabney v. Augusta Mut. Ins. Co., 282 Va. 78, 86, 710 S.E.2d 726, 731 (2011) (quoting Jenkins, 266 Va. at 43, 581 S.E.2d at 512 (internal citations omitted)). The rationale for this rule is clear: "'[e]very litigant is entitled

20

to be told by his adversary in plain and explicit language what is his ground of complaint or defense. . . . The issues in a case are made by the pleadings, and not by the testimony of witnesses or other evidence.'" Id. (quoting Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp., 221 Va. 1139, 1141, 277 S.E.2d 228, 230 (1981)).

Here, WAT admittedly failed to include a claim in its complaint that White Cloud's construction of the new bridge violated Section 3.3(C)(v) of the Easement. WAT contends that the trial court nevertheless erred by refusing to consider this purported claim because WAT presented evidence at trial pertaining to this matter, and White Cloud allegedly failed to argue that there was a variance between WAT's pleadings and this evidence. Countering this argument, White Cloud contends that it established below that it was surprised at trial by this evidence and, accordingly, it would have been subject to unfair prejudice had the trial court considered the purported claim. See Manchester Oaks Homeowners Ass'n v. Batt, 284 Va. 409, 426, 732 S.E.2d 690, 701 (2012) (explaining that defendant may not be prejudiced by inability to prepare to defend against new claim raised at trial).

Regardless, however, of the merits of White Cloud's challenge to the subject evidence at trial, we affirm the trial court in rejecting WAT's purported claim for the threshold reason that WAT does not assert on appeal that the trial court erred in denying to it any request to amend its complaint or otherwise conform its pleadings to the evidence that WAT offered in support of such claim. See Code § 8.01-377 (addressing amendment of pleadings "when variance appears"); Culmore Realty Co. v. Caputi, 203 Va. 403, 407, 124 S.E.2d 7, 10 (1962) (explaining that parties may be permitted to amend their pleadings to conform to the evidence "in proper cases" when requested).

21

### III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the trial court.

Affirmed.

JUSTICE ROUSH, with whom SENIOR JUSTICE LACY joins, dissenting.

In its sixth assignment of error, appellant Wetlands America Trust, Inc. ("WAT") argues that "[t]he trial court erred when it applied the common law principles of restrictive covenants to a conservation easement." I agree. Therefore, I would reverse and remand this case with directions to reconsider after applying the proper standard for interpreting ambiguities in conservation easements.

As the majority notes, the trial court correctly determined that certain terms in the easement agreement are ambiguous. Those ambiguities required the trial court to employ rules of construction to resolve their meanings. The trial court stated that "under Virginia case law restrictive covenants are not favored" when construing the provisions deemed ambiguous. Quoting from Waynesboro Village, L.L.C. v. BMC Properties, 255 Va. 75, 80, 496 S.E.2d 64, 67-68 (1998), and Friedberg v. Riverpoint Building Committee, 218 Va. 659, 665, 239 S.E.2d 106, 110 (1977), the trial court continued:

> Valid covenants restricting the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains. Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property.

Relying on this doctrine, the trial court construed all ambiguities it found in the conservation easement against WAT and in favor of White Cloud.

22

The majority affirms the construction adopted by the trial court, reasoning that the Virginia Conservation Easement Act (the "VCEA") abrogated the common law relative to conservation easements in "certain significant respects,"[1] but did not abrogate the common law strict construction principle applied to restrictive covenants in gross. I disagree.

The common law was abrogated with regard to negative easements in gross for conservation purposes well before the enactment of the VCEA in 1988. In United States v. Blackman, 270 Va. 68, 613 S.E.2d 442 (2005), we considered the validity of a negative easement in gross for the purpose of conservation and historic preservation created in a 1973 conveyance. We reviewed the history of negative easements in gross and noted that the common law restrictions on easements in gross were abrogated "long ago." Id. at 78, 613 S.E.2d at 446. We further observed that the significance of the 1962 amendment to Code § 55-6 adding "easements in gross" to those property interests that could be transferred by deed or will was "manifest." Id. at 78, 613 S.E.2d at 447. We concluded that "[e]asements in gross, whether affirmative or negative, are now recognized interests in real property, rather than personal covenants not capable of being disposed of by deed or will as was the case under common law." Id.

In Blackman, we specifically rejected the argument that a negative easement in gross for conservation purposes was not valid before the enactment of the VCEA, concluding that "it is clear that the VCEA did not create a new right to burden land by a negative easement in gross for the purpose of land conservation and historic preservation." Id. at 81-82, 613 S.E.2d at 448. Accordingly, while the VCEA comprehensively addressed the conservation easements of the

---

[1] The majority states that the VCEA abrogated the common law by approving a "conservation easement containing 'in gross' and restriction components (i.e., an easement not appurtenant to any real property that 'impos[es] limitations' on the encumbered land), coupled with a 'perpetual' duration." Supra at 8-9 (alteration in original, citations omitted).

23

type at issue here, legislation abrogating the use of negative restrictive easements in gross for conservation purposes was enacted long before the VCEA was adopted in 1988.

Contrary to the majority's conclusion, the common law principle of strict construction in favor of free use of land no longer applies to conservation easements. The strict construction principle was applied under the common law because easements in gross, including negative easements in gross, were disfavored as a matter of public policy. Today, and for at least the last four decades, Virginia public policy strongly favors the conservation of land and open spaces. Since 1971, the Constitution of Virginia has provided in relevant part:

> [I]t shall be the Commonwealth's policy to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth.
> . . . .
> In the furtherance of such policy, the General Assembly may undertake the conservation, development, or utilization of lands or natural resources of the Commonwealth, . . . and the protection of its atmosphere, lands, and waters from pollution, impairment, or destruction, by . . . leases or other contracts with . . . private persons or corporations.

Va. Const. art. XI, §§ 1, 2. To further the public policy in favor of conservation, the General Assembly in 1988 adopted the VCEA, Code §§ 10.1-1009 through -1016, in accord with policies in place since 1966 under the Open-Space Land Act, Code §§ 10.1-1700 through -1705.[2] As we noted in Blackman, "[t]hese statutes evince a strong public policy in favor of land conservation." 270 Va. at 79, 613 S.E.2d at 447. Thus, even before the enactment of the VCEA in 1988, "Virginia . . . was committed to encouraging and supporting land conservation . . . in the

_____

[2] Other statutes reflecting this public policy include the act creating the Virginia Outdoors Foundation, Code §§ 10.1-1800 through -1804, and the Virginia Land Conservation Incentives Act of 1999, Code §§ 58.1-510 through -513. This latter statute grants tax credits "to supplement existing land conservation programs to further encourage the preservation and sustainability of Virginia's unique natural resources, wildlife habitats, open spaces and forested resources." Code § 58.1-510. See Code § 58.1-512.

24

Commonwealth, as evidenced by the constitutional and statutory expressions of the public policy." Id. at 81, 613 S.E.2d at 449.

Applying a common law principle of strict construction to conservation easements which is based on a policy disfavoring easements in gross cannot be reconciled with our reasoning in Blackman that both the Constitution of Virginia and Virginia's various statutes promoting conservation and historic preservation "evince a strong public policy in favor of land conservation and preservation of historic sites and buildings." Id. at 79, 613 S.E.2d at 447. The oft-stated policy of the Commonwealth in favor of conservation easements such as the type at issue here could not be a clearer rejection of the common law strict construction principle.

The majority bases its holding that the rules of strict construction apply to conservation easements on the provision in Code § 10.1-1014 that states "[e]xcept as otherwise provided in this chapter, a conservation easement may be created, conveyed, recorded, assigned, released, modified, terminated, or otherwise altered or affected in the same manner as other easements." That interpretation ignores the common law principles of contract interpretation which provide that where, as in this case, an easement is created by deed, the easement should be interpreted in accordance with Virginia's rules of construction for deeds. Pyramid Dev., L.L.C. v. D&J Assocs., 262 Va. 750, 754, 553 S.E.2d 725, 728 (2001); Gordon v. Hoy, 211 Va. 539, 541, 178 S.E.2d 495, 496 (1971). In CNX Gas Co. LLC v. Rasnake, 287 Va. 163, 752 S.E.2d 865 (2014), we summarized our rules for interpreting deeds as follows:

> Where language in a deed is ambiguous, the language must be construed against the grantor and in favor of the grantee. We have called this rule "one of the most just and sound principles of the law because the grantor selects his own language." A grantor must be considered to have intended to convey all that the language he has employed is capable of passing to his grantee.
>
> Other rules of construction also apply when language in a deed is found to be ambiguous. The whole of a deed and all its parts should be considered together.

25

Effect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or meaningless. Where the meaning of the language is not clear, or the deed is not artfully drawn, the court should interpret its terms to harmonize them, if possible, so as <u>to give effect to the intent of the parties</u>.

<u>Id.</u> at 167-68, 752 S.E.2d at 867 (citations omitted, emphasis added). Nothing in these rules for interpreting deeds provides for a rule of strict construction of the type advanced by the majority.

Section 1.1 of the conservation easement at issue in this case expresses the intent of the parties as follows:

It is the purpose of this Easement to assure that the Protected Property will be retained <u>in</u> <u>perpetuity</u> predominantly in its natural, scenic, and open condition, as evidenced by the [Baseline Documentation Report], for conservation purposes as well as permitted agricultural pursuits, and to prevent any use of the Protected Property which will impair significantly or interfere with the conservation values of the Protected Property, its wildlife habitat, natural resources or associated ecosystem . . . .

<u>See</u> Deed of Gift of Conservation Easement at 5 (emphasis in original).

Accordingly, ambiguous provisions of conservation easements should be construed consistent with the foregoing rules of contract construction as they apply to deeds. Any ambiguities in a conservation easement, including the easement at issue in this case, should be construed to give effect to the intention of the parties, to give effect to the circumstances surrounding the creation of the easement, to carry out the policy in favor of the conservation of land, and to resolve ambiguities in favor of the grantee.[3]

---

[3] Although we have not adopted the Restatement's standard for interpreting servitudes, it is consistent with settled Virginia law:

(1) A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created.

In summary, for the reasons stated, I respectfully dissent from the majority opinion and conclude that the trial court applied the incorrect standard in interpreting the conservation easement. Accordingly, I would reverse the judgment and remand the case to the trial court with directions to construe any ambiguities in the conservation easement consistent with the principles set out above.

---

> (2) Unless the purpose for which the servitude is created violates public policy, and unless contrary to the intent of the parties, a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred.

Restatement (Third) of Property: Servitudes § 4.1 (2000).