COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Ortiz, Raphael and White
Argued at Virginia Beach, Virginia


THORNTON TAYLOE, ET AL.

                                  MEMORANDUM OPINION[*] BY
v.       Record No. 2044-23-1        JUDGE KIMBERLEY SLAYTON WHITE
                                       JULY 15, 2025
DERRICK KINSEY, ET AL.


FROM THE CIRCUIT COURT OF NORTHAMPTON COUNTY
W. Revell Lewis, III, Judge

Norman A. Thomas (Ralph E. Main, Jr.; Charles M. Lollar; Norman
A. Thomas, PLLC; Dygert, Wright, Hobbs & Hernandez, PLC;
Lollar Law, PLLC, on briefs), for appellants.

Douglas E. Kahle (Zachary A. Handlin; Basnight, Kinser, Leftwich
& Nuckolls, P.C., on brief), for appellees.


The principal question in this appeal is whether an easement to use a "Wharf Facility on

the easternmost portion of the lands of the Grantor" grants access to the entire waterfront parcel

or to only a pier on the easternmost portion of that parcel.  Finding that the trial court correctly

interpreted the easement to grant access only to the pier on the easternmost portion of the parcel,

we affirm.

BACKGROUND

This matter arises from a dispute among neighbors who own property in tidewater

Virginia known as "The Shore."  The property includes three lots, each with different owners

who have enjoyed the use of the waterfront attached to one of the lots.  The use of this waterfront

property is at the center of the disagreement.  This case presents an appeal of the circuit court's

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

interpretation of certain deeds, which grant two easements over the waterfront lot. The easements at issue benefit Parcels B-1 and C, which are owned or occupied by the appellants (the Tayloes). The easements burden the property of the appellees (the Kinseys), Parcel B-2, the waterfront lot.

The disagreements with their neighbors over the use and location of the easements led the Kinseys to sue the Tayloes. Those sued were Thornton and Kate Tayloe and their two minor children; Salt Grove Properties, LLC, the company through which Thornton and Kate own Parcel B-1; and Louise F. Tayloe and Edward D. Tayloe, II, who are Thornton Tayloe's parents and the owners of Parcel C. The Tayloes counterclaimed. Following a hearing on the issuance of a preliminary injunction and a trial on the merits, the trial court granted relief sought by the Kinseys. The Tayloes assigned error to numerous rulings by the trial court. We disagree that the trial court erred and affirm its decision.

The Tayloes and the Kinseys are neighbors situated on three plots of land. The land is located on the Chesapeake Bay side of the Eastern Shore, with one of the plots fronting on and with access to both Cherrystone Creek and Eyre Hall Creek. Thornton and Kate Tayloe reside on the parcel known as B-1; the Kinseys reside on the parcel known as B-2, the water-front parcel at the center of the dispute; and Louise and Edward Tayloe reside on the parcel known as

C.[1]  The deeds of conveyance created certain easements, the scope of which are the central issue of this case.

*The Creation of the Easements at Issue*

In 1993, Salt Grove, L.C.,[2] acquired the entire tract of land that now constitutes the three parcels from David Steelman, II, and, at the same time, also put to record was a Declaration of Restrictive Covenant and Grant of Easement ("Declaration") affecting all three parcels, with



Trial Exhibit A, Plat Book 21, Page 59.

[2] The principal member of Salt Grove, L.C., was Eyre Baldwin, whose interactions with the Tayloes become relevant later.

some provisions running with the land and others being personal to Steelman and not assignable. Salt Grove, L.C., subdivided what was originally Parcel B into Parcels B-1 and B-2 in 1995.

The deed language Salt Grove, L.C., used in its initial conveyance includes, in relevant part:

> And together with an easement to use that certain Wharf Facility located on the easternmost portion of the lands of the Grantor. Such easement shall include the right and privilege to moor one (1) vessel of up to twenty-six (26') feet in length, at the pier currently located on the premises or at any replacement pier constructed by the Grantor . . . .  This easement includes the right to use the boat ramp now located on the premises, or any replacement ramp hereafter constructed at the Wharf Facility by Grantor . . . to provide ingress and egress to and from the waters of the Commonwealth.  This easement includes a further right of ingress and egress to and from the Wharf Facility over such other portions of the lands of Grantor not exceeding twenty feet (20') in width as may be reasonably designed and relocated by Grantor, at its expense . . . from time to time.  This easement shall be appurtenant to and run with the lands conveyed herein, and shall be for recreational purposes only.  The Grantees agree . . . that they shall be bound by the covenants and restrictions contained herein and in other instruments in the chain of title, and further agree to be bound by other covenants, rules and regulations applying to all users of the Wharf Facility as may be promulgated from time to time by Grantor, its successors or assigns.

The deed also sets forth that "[t]he Grantees and their heirs and assigns shall not utilize the easements in any manner that unreasonably interferes with the use of the Wharf Facility by the Grantor, its successors and assigns."

### Parcel C

In 1993, prior to the subdivision of Parcel B, Salt Grove, L.C., conveyed Parcel C to Theodore and Ruth Flannagan (the "Flannagans").  The deed contained a utility easement and an ingress and egress easement to access Parcel B across Salt Grove, L.C.'s "remaining lands."

Salt Grove, L.C., also conveyed to the Flannagans "an easement to use that certain Wharf Facility located on the easternmost portion of the lands of the Grantor."

In 2008, the Flannagans conveyed Parcel C to Louise and Edward Tayloe. The deed conveyed to them the same easement to access and use the "Wharf Facility" in accordance with the same terms. It likewise expressly made the conveyance subject to the recorded Declaration, which is discussed below.

*Parcel B-1*

By deed, in 1998, Salt Grove, L.C., conveyed Parcel B-1 to Earl Williams Walker. The deed provided a utility and ingress and egress easement to access B-1 and made the conveyance subject to the recorded Declaration. The deed also granted an appurtenant "transferable, perpetual easement to use that certain Wharf Facility located on the easternmost portion of the lands of the Grantor." The deed nearly mirrored the language used in the 1993 Flannagan Deed, although one relevant exception was that the deed allowed the grantee the "right and privilege" to moor a boat of greater length, "up to thirty-one (31') feet in length . . . at the pier currently located on Parcel 'B-2' or at any replacement pier . . . ."

In 2003, Walker conveyed Parcel B-1 by deed to Louise Tayloe. The deed conveyed to her the same "transferable, perpetual easement to use that certain Wharf Facility" as provided for in the 1998 Deed from Salt Grove, L.C., to Walker. Louise then conveyed Parcel B-1 to Salt Grove Properties, LLC, a company owned by Thornton and Kate Tayloe.[3] The deed to Salt Grove Properties, LLC, included conveyance of the "transferable, perpetual easement to use that certain Wharf Facility . . . more particularly described in the deed dated February 9, 1998." Both deeds made Parcel B-1 subject to the Declaration.

---

[3] Salt Grove Properties, LLC, is an entirely separate entity from Salt Grove, L.C. Salt Grove, L.C., originally sold Parcel B-1 to Walker and Parcel C to the Flannagans.

*Parcel B-2*

Salt Grove, L.C., eventually changed its name to Salt Grove Investors, LLC, and, by deed dated June 24, 2021, conveyed Parcel B-2 to the Kinseys. The conveyance acknowledged that Parcel B-2 is burdened with the easements benefitting Parcels B-1 and C. The deed made the conveyance subject to "all the easements, conditions, covenants, restrictions, and reservations contained in duly recorded deeds and plats and other instruments constituting constructive notice in the chain of title to the property," which includes the Declaration.

Today, Parcel B-2 contains various structures and attributes. An oyster watch house, which is currently used by the Kinseys as a residence on Parcel B-2, is located on the western end of the parcel. On the easternmost portion of the parcel is a pier, bulkhead, and boat ramp.

*The Declaration of Restrictive Covenants and Grant of Easement*

The Declaration is dated February 11, 1993, and declared covenants and granted easements from Salt Grove, L.C., to Steelman—some running with the land and some personal, not running with the land. Article I subjects both Parcels B and C to its provisions (now Parcels B-1, B-2, and C). These provisions run with the land: "All of the Restrictions shall run with the land, except as otherwise set forth herein . . . ." Article III, however, applies only to the property of and the conduct of Steelman and his family: "Such easements are easements in gross, or personal, and for the use of the Grantees . . . , and such rights are not assignable or transferrable, and do not run with the land . . . ."

Between Articles I and III, Article II provides for the modification of the restrictions. The article permits "modifi[cation], supplement[ation], delet[ion] or revis[ion] by the Declarant," Salt Grove, L.C., and "thereafter by the fee simple owners of the Property." Later in the article, the power to modify the restrictions is limited, but only so long as the Article III easement holder is living. The limitation would require a majority of the adults holding the Article III easement in

gross to agree to proposed changes. In addition, the limitation only applied to the restrictions on the use of the facility contained in Article IV. While perhaps intending to refer to Article V, the article which lists the restrictions running with the land, Article IV lists the responsibilities of those for the upkeep of the Wharf Facility. The restrictions running with the land and applicable to the entire property contained within Article V included the forbidding of:

(1) Condominiums;

(2) Restaurants;

(3) Crab processing;

(4) Use of Wharf Facility as commercial fuel dock;

(5) Nuisances;

(6) Keeping derelict or abandoned vessels; and

(7) Regular storage of seafood products.

The restrictions also required that all boat slips and dockage areas be kept in a clean and orderly manner, that all boats be docked in a clean and orderly manner, that all boat owners using the Wharf Facility to moor their boats keep those boats compliant with governmental regulations, and that all seafood products "handled at the Wharf facility shall be properly packaged and handled in strict accordance with [maritime and health regulations]."

The personal easement granted to the Steelman family allowed for the use of a pier and a boat ramp, and for the ingress and egress to those structures. It further allowed for the mooring of vessels of up to a specific length.

*The Alleged Ambiguity*

The deeds' easement language does not expressly define the term "Wharf Facility." While the entirety of Parcel B-2 was historically referred to as the Wharf Facility, because for many years its piers and bulkheads were leased to third parties engaged in the seafood industry,

- 7 -

the Kinseys argue that the entirety of B-2 has more recently been referred to as Salt Grove by both the Kinseys and the prior owner. The Kinseys argue that the term "Wharf Facility" is meant to limit the easement only to those physical structures located on the easternmost portion of B-2, and not to include the entirety of the parcel. The Tayloes contend otherwise.

*The Use of the Property Before the Kinseys*

Thornton and Kate Tayloe have lived in their home on Parcel B-1 since 2004. Louise and Edward Tayloe use Parcel C as a second home. For some sixteen years, the Tayloe family regularly used the entirety of Parcel B-2, as did the Flannagans. Salt Grove, L.C.'s member, Baldwin, gave the Tayloes a key of their own to the office located on Parcel B-2, and allowed them to use the bathroom there, as well as allowed them to draw and use the gasoline stored there, requiring only that the Tayloes record their usage. He also allowed the Tayloes to use the electricity, including to "turn on the lights under the pole shed and go fishing for rockfish."

The Tayloes entered Parcel B-2 and engaged in recreational activities, including boating and kayaking, launching and retrieving their boats, crabbing and fishing from the bulkhead and their designated pier, parking in the oyster-shell parking lot in front of their boat slips while out on or servicing their boats, and checking on their boats when moored in their designated boat slips. The Tayloe children would ride their bikes down to the piers to check crab pots, and adults would sit and read.

Baldwin made improvements to Parcel B-2, including demolishing and converting older structures. By 2016, the improvements included an "oyster watch house" described as a place to watch oyster beds. He also created an upstairs apartment in the watch house, which he began renting out. He also offered the property as a place to host weddings.

Thornton and Kate Tayloe grew unsettled with Baldwin's wedding business. They claimed that these events brought in significant numbers of people. Thornton and Kate

explained that "there were people parked everywhere," including in their yard on Parcel B-1. They testified that guests would also park in front of the boat ramp located on Parcel B-2 "so we couldn't use it." Thornton and Kate met with Baldwin about these issues. Baldwin assured them that "it's not a big deal; it's only going to be three or four months during the summer every weekend." After two summers of the activities, Thornton and Kate complained to Northampton County officials, who thereafter shut down the short-term apartment rentals and the property's usage for weddings and events. Thornton and Kate claim that, at that point, Baldwin began a retaliatory campaign in response to their complaint.

In 2020, Baldwin unilaterally created an unsigned, unrecorded list of some twenty-eight "Rules and Regulations" that purported to restrict the Tayloes' use of Parcel B-2's amenities. Its provisions purported to "apply to all users, tenants, easement holders and/or their invitees upon this property." The Rules and Regulations claimed the power to terminate the easements benefitting Parcels B-1 and C and to assess attorney fees and expenses.

*The Tayloes and Kinseys*

The Tayloes and Kinseys were friendly when the Kinseys first bought B-2 in 2021 from Salt Grove, L.C. The initial good relationship deteriorated, and the Kinseys sought to enforce Baldwin's Rules and Regulations against the Tayloes, ultimately initiating this lawsuit to terminate the Parcels B-1 and C easements.[4]

In bringing their suit, the Kinseys alleged that the Tayloes violated the terms of the easements by exceeding their rights to use the Wharf Facility. The Kinseys alleged that the Tayloes' objectionable actions included placing kayaks on the main dock in a manner that

---

[4] The Kinseys' closing argument clarified that they were seeking neither injunctive relief against Louise and Edward Tayloe nor to terminate Parcel C's easement. The Kinseys attempted to enforce the Baldwin Rules, but the trial court found them unenforceable. The trial court's final order reflects that holding; the Kinseys assigned no cross-error to it.

blocked access by other users; sending their children down to the floating dock daily, from where the Tayloe children would refuse to leave when asked by the Kinseys; fishing and crabbing from the bulkhead; asserting and exercising a non-existent right to trespass onto areas not described in the easements or designated as being within the ingress and egress easement; using the parcel for commercial purposes; interfering with the rights of the Kinseys' tenant and with the Kinseys' use and enjoyment of the oyster watch house, as the Tayloes would "film [them]"; and by calling the police on the Kinseys' guests alleging that those guests could not be on the property. The Kinseys entered photos and statements into evidence which further demonstrated the Tayloes' activities.

PROCEDURAL OVERVIEW

Count I of the Kinseys' complaint sought injunctive relief against each of the Tayloe family members, including the minor Tayloe children, to "cease and desist" trespassing or "otherwise acting in any manner that exceeds" their easement rights. Count II of the complaint was the Kinseys' request that the circuit court terminate the easements and award them attorney fees and expenses.

The Tayloes' declaratory judgment counterclaim alleged the chain of title to their respective parcels and asserted that the Kinseys (and their immediate predecessor in title) had unreasonably interfered with and sought to "impermissibly restrict their easement rights to use the Wharf Facility," including through a series of purported Rules and Regulations. They alleged that the Kinseys sought to limit: the "usage area of the Wharf Facility"; access to the Facility; the "types of usage"; and the "times of usage." Furthermore, they asserted that the Kinseys intentionally hindered their recreational use of their easement through the "imposition of restrictive rules having no *nexus* with the intended use of the Wharf Facility."

The Tayloes requested that the circuit court enter a declaratory judgment determining the "physical scope of the Wharf Facility"; their "usage rights" as granted by the easements; whether the Rules and Regulations constituted an unreasonable interference with their easement rights; whether the Kinseys, as owners of Parcel B-2, could unilaterally impose restrictions on their easement rights; and whether the Kinseys had a right to terminate their perpetual easements.

The Kinseys also sought a preliminary injunction. The trial court conducted a hearing on the preliminary injunction in August 2022 and entered an order temporarily enjoining Thornton and Kate Tayloe and their children from going "northwest of the line drawn by the Court" on a copy of a Wharf Facility plat as "entered into the Court's file."

The trial occurred in June 2023, and the final order was entered on October 30, 2023. In this final order, the circuit court held that the "Wharf Facility" relates to those man-made improvements constructed along the easternmost portion of Parcel B-2 and not to the entirety of Parcel B-2. The court identified those man-made improvements as the dock, the bulkhead, the pier, the mooring pilings, and the boat ramp. The court clarified that

> the Wharf Facility easements granted for the benefit of Parcels B-1 and C consists of: . . . the right and privilege to moor one vessel up to 31 feet in length [26 feet in length for Parcel C] with a beam not exceeding 11 feet, 4 inches at a dock located at the Wharf Facility, as may be reasonably designated and relocated by the owner of Parcel B-2 from time to time; . . . the right to use the boat ramp now located on Parcel B-2 or any replacement ramp to provide ingress and egress to and from the waters of the Commonwealth; and . . . a right of way of ingress and egress across Parcel B-2 to and from the Wharf Facility not to exceed 20 feet in width. The easements are appurtenant to and run with Parcels B-1 and C and are for recreational uses only.

Additionally, the owners of B-1 and C, and their invitees, are bound by the covenants and restrictions appearing in their chains of title, as well as by the rules and regulations applying to all users of the Wharf Facility as may be promulgated by the owner of Parcel B-2. The court found that, appurtenant to Parcels B-1 and C, an implied reasonable turn-around easement exists

- 11 -

over the area adjacent to the Wharf Facility to enable vehicles with or without boats and trailers attached thereto to turn around and an implied easement to park their respective vehicles in designated parking areas. Made a part of the final order was a plat of what the trial court considered the Wharf Facility.[5]

Finally, the court found that Thornton and Kate Tayloe committed civil trespass by going on portions of Parcel B-2 that were not included within the Wharf Facility easement. As such, Thornton and Kate were permanently enjoined from going on any portion of Parcel B-2 that is outside the limits of the easements and were further ordered to post a $20,000 bond.

<hr>

[5]



The Tayloes assign several errors to the circuit court's final order. Specifically, the Tayloes assert that the circuit court erred in determining that the scope of the easement was limited to those man-made structures located on the easternmost portion of Parcel B-2 and instead contend that the term "Wharf Facility" refers to the entirety of Parcel B-2, thus allowing the Tayloes access to all the Kinseys' property. The Tayloes also argue that the circuit court erred in limiting their activities conducted within the easement. Furthermore, based on that interpretation of the deed language, the Tayloes allege that the circuit court's creation of the implied turn-around and parking easements is in error. The Tayloes also assert that the Kinseys cannot impose rules upon the users of the Wharf Facility unilaterally. Finally, the Tayloes contend that the court erred in finding that Thornton and Kate committed any civil trespass. Ultimately, all of the assertions made by the Tayloes hinge upon the interpretation of the use and the location of the easement.

Our review of the decision of the trial court requires that, with regard to those purely factual determinations made by the circuit court, "we will not disturb those findings unless they are plainly wrong or without evidence to support them." *Wetlands Am. Tr., Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 160 (2016) (quoting *Perel v. Brennan*, 267 Va. 691, 698 (2004)). In reviewing those findings, we view the evidence "in the light most favorable to the prevailing parties." *Id.* (quoting *Carter v. Carter*, 223 Va. 505, 509 (1982)).

"An easement is a privilege held by one landowner to use and enjoy certain property of another in a particular manner and for a particular purpose." *Anderson v. Delore*, 278 Va. 251, 256 (2009) (citing *United States v. Blackman*, 270 Va. 68, 76 (2005); *Stoney Creek Resort, Inc. v. Newman*, 240 Va. 461, 464 (1990); *Bunn v. Offutt*, 216 Va. 681, 684 (1976)). Virginia law long has recognized that this privilege encompasses an affirmative right to use and enjoy the encumbered

property free from interference by the grantor of the easement or by other persons. *Bunn*, 216 Va. at 684. An easement appurtenant has both a dominant and a servient tract and is capable of being transferred or inherited; easements appurtenant are frequently said to "run[] with the land," meaning that the benefit conveyed by, or the duty owed under the easement passes with the ownership of the land to which is it appurtenant. *Blackman*, 270 Va. at 77.

In settling a dispute between landowners regarding the terms of an express easement granted by deed, "we apply the customary rules governing the construction of written documents." *Anderson*, 278 Va. at 257. As with other contracts, we review a trial court's construction of a deed of easement de novo. *Wetlands Am. Tr., Inc.*, 291 Va. at 160 (citing *Marble Techs., Inc. v. Mallon*, 290 Va. 27, 33 (2015)). Thus, we ascertain the rights of the parties from the words set forth in the deeds. *Pyramid Dev., L.L.C. v. D&J Associates*, 262 Va. 750, 754 (2001).

> *A. The circuit court did not err in its interpretation of the deeds' language nor of the boundaries of the easements at issue.*

The Tayloes' assignments of error question the circuit court's interpretation of the deeds of easements' language. First, the Tayloes generally allege that the trial court misinterpreted the deeds of easement appurtenant to and burdening Parcel B-2 as to the Wharf Facility, and therefore incorrectly attenuated their property rights and privileges as Parcels B-1 and C's owners. Second, the Tayloes contend that the court incorrectly determined the boundaries, area, and constituent parts of the Wharf Facility by limiting it to "the man-made improvements comprising [of] . . . the dock, the bulkhead, the pier, the mooring pilings and the boat ramp."

Supporting their claim of misinterpretation, the Tayloes first advance a statutory argument, relying on the minimally interpreted Code § 55.1-305 relating to the reasonableness of easements. They then advance the argument that the deed language was not ambiguous and that the unambiguous language and scope of the deeds and easement were misinterpreted by the court. We address each argument in turn.

- 14 -

*i. Code § 55.1-305*

The Tayloes begin with the assertion that "[t]he General Assembly established a mutual reasonableness standard applicable to all easements in Code § 55.1-305." They argue that Virginia caselaw "recognizes this reasonableness standard." Code § 55.1-305, relating to the enjoyment of easements, was first enacted in 2003 by the General Assembly as Code § 55-50.1 and was recodified as Code § 55.1-305 in 2019. It reads, in relevant part:

> Unless otherwise provided for in the terms of an easement, the owner of a dominant estate shall not use an easement in a way that is not reasonably consistent with the uses contemplated by the grant of the easement, and the owner of the servient estate shall not engage in an activity or cause to be present any objects either upon the burdened land or immediately adjacent to such land that unreasonably interferes with the enjoyment of the easement by the owner of the dominant estate.

Code § 55.1-305.

The Tayloes maintain that the circuit court's interpretation of the scope of the easements violated Code § 55.1-305 by its "judicial attenuation of the easement rights benefitting parcels B-1 and C." This, however, is not the case.

Here, Code § 55.1-305's language clearly applies to and governs the specific conduct of the parties involved in a given easement, not the interpretation of the scope of an easement. Where statutory language is unambiguous, this Court is "bound by the plain meaning of that statutory language." *Jones v. Commonwealth*, 296 Va. 412, 415 (2018) (quoting *Alston v. Commonwealth*, 274 Va. 759, 769 (2007)). Although there may be a reasonableness standard custom in Virginia caselaw when interpreting the scope of the use of an easement or the apparent conduct of parties regarding an easement, Code § 55.1-305 regulates only the conduct of parties, and not the interpretation of the easement by a court. Thus, Code § 55.1-305 is irrelevant to this analysis.

*ii. The language of the deeds is unambiguous.*

Just as we review the interpretation of a deed of easement, we also review de novo the fundamental question of whether a deed is ambiguous. *Wetlands Am. Tr., Inc.*, 291 Va. at 160 ("[t]he question whether a writing is ambiguous is not one of fact but of law" (quoting *Langman v. Alumni Ass'n of the Univ. of Va.*, 247 Va. 491, 498 (1994))); *see also Dye v. CNX Gas Co.*, 291 Va. 319, 323 (2016) (explaining that whether a deed is ambiguous is a "strictly legal issue").

This Court's function in construing a deed is to give effect to the parties' intention as expressed by them in the words they have used. *Camp v. Camp*, 220 Va. 595, 597-98 (1979). "Where the language of [the] deed clearly and unambiguously expresses the intention of the parties, no rules of construction should be used to defeat that intention." *Swords Creek Land P'ship v. Belcher*, 288 Va. 206, 212 (2014) (quoting *CNX Gas Co. v. Rasnake*, 287 Va. 163, 166-67 (2014)). In interpreting the meaning of a deed of easement, "[w]e normally give the words used by the parties 'their usual, ordinary, and popular meaning. No word or clause in the [deed] will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.'" *Wetlands Am. Tr., Inc.*, 291 Va. at 161 (second alteration in original) (quoting *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 516 (2014)).

Relatedly, "[e]ffect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or meaningless." *CNX Gas Co.*, 287 Va. at 168 (citing *Auerbach v. County of Hanover*, 252 Va. 410, 414 (1996); *Foster v. Foster*, 153 Va. 636, 645 (1930)). Thus, "[t]he whole of a deed and all its parts should be considered together" to determine the controlling intent. *Id.* (citing *Auerbach*, 252 Va. at 414).

When the deed, so construed, is plain and unambiguous, we are "not at liberty to search for its meaning beyond the instrument itself." *Va. Elec. Power Co. v. N. Va. Reg'l Park Auth.*, 270 Va. 309, 316 (2005). An instrument will be deemed to be unambiguous if its provisions are "capable of

only one reasonable construction." *Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289 (1992) (citation omitted). A deed will be deemed ambiguous, and thus require judicial interpretation, however, if its "language admits of being understood in more than one way or refers to two or more things at the same time." *Amos v. Coffey*, 228 Va. 88, 92 (1984) (quoting *Renner Plumbing v. Renner*, 225 Va. 508, 515 (1983)). "'Only when the language is ambiguous may a court look to parol evidence, or specifically, to the language employed in light of the circumstances surrounding the parties and the land at the time the deed was executed' in order to discern the parties' intent." *Marble Techs., Inc.*, 290 Va. at 33 (quoting *Pyramid Dev., L.L.C.*, 262 Va. at 754).

But a deed is not ambiguous "merely because the parties disagree as to the meaning of the language employed." *Amos*, 228 Va. at 92 (quoting *Wilson v. Holyfield*, 227 Va. 184, 187 (1984)); *see Worsham v. Worsham*, 74 Va. App. 151, 171 (2022) (observing that "ambiguity is not created . . . even when 'courts in different jurisdictions' disagree" about the proper interpretation (quoting *Bartolomucci v. Fed. Ins.*, 289 Va. 361, 371 (2015))). Similarly, the fact that analysis is required does not, standing alone, suggest ambiguity. *See Wetlands Am. Tr., Inc.*, 291 Va. at 161 ("Each part of a deed 'must be construed with reference to the whole, so as to make it harmonious and sensible as a whole.'" (quoting *Hinton v. Hinton*, 209 Va. 544, 545-46 (1969))).

The Tayloes argue that the deed language granting the easements is unambiguous. They state that, in February 1993, the Steelmans conveyed the entirety of Parcels B and C to Salt Grove, L.C. Parcel B had not yet been subdivided, and it was not subdivided into Parcels B-1 and B-2 when Salt Grove, L.C., conveyed Parcel C to the Flannagans in September 1993. The deed from Salt Grove, L.C., to the Flannagans for Parcel C conveys, "an easement to use that certain Wharf Facility located on the easternmost portion of the lands of the Grantor."

The Tayloes maintain that, at that moment in time, the "easternmost portion" of Salt Grove, L.C.'s "lands" was what is now known as the entirety of Parcel B-2. They contend that this

- 17 -

unambiguous deed language did not refer to any "man-made improvements" nor did it use any other limiting terms that might differentiate the entire peninsula from something "on" that peninsula, and that "[t]here is nothing in the record to indicate that the language used in each of the deeds means anything other than it meant when first used by Salt Grove, L.C." According to the Tayloes, the meaning of Wharf Facility within the deeds unequivocally refers to the entirety of Parcel B-2.[6]

The Kinseys, on the other hand, rely on the fact that the term "Wharf Facility" is not explicitly defined in neither the deeds nor the Declaration to assert that the deed language is, in fact, ambiguous. The Kinseys contend that the circuit court's contextual interpretation of the scope of the easement is correct. While we disagree with the Kinseys and hold that the deeds of easement are unambiguous as they pertain to the term "Wharf Facility," the unambiguous language was correctly interpreted by the circuit court to limit the scope of the easement to the man-made structures built along the easternmost portion of Parcel B-2.

The deeds of easement here grant "a transferable, perpetual easement to use that certain Wharf Facility located on the easternmost portion of the lands of the Grantor." The deeds then enumerate the allotted uses of the easement, including mooring a vessel of specified length at a pier, using the boat ramp, a right of ingress and egress to the water, a right of access of a specified size to the property, and that the easement be used only for recreational purposes.

---

[6] The Tayloes allege that the Kinseys assumed successively inconsistent and contradictory positions in their pleadings and at trial and that it was in error for the circuit court to fail to hold the Kinseys to their pleadings. We may easily dispose of this argument, as the Tayloes failed to specifically identify this argument in any of their assignments of error and failed to cite to any portion of the record where this argument was actually made before the trial court. Under Rule 5A:20, therefore, this argument is waived. Furthermore, the Tayloes' argument is fundamentally flawed. The Tayloes argue that because the Kinseys discuss the history of the disputed property in their pleadings, they have made a party admission that the "easternmost portion" of "that certain Wharf Facility" in the deed language refers to the entirety of Parcel B-2.

The trial court consulted the dictionary definitions of the words "wharf" and "facility" to confirm their meaning. Although dictionary definitions are not binding, they are often consulted in cases such as this one. *See Wetlands Am. Tr., Inc.*, 291 Va. at 167. We simply regard such dictionary definitions to be appropriate for consideration in determining the proper meaning of "Wharf Facility" in the context of the easements where this term is undefined. *Id.* We do this as part of our necessary duty to, in interpreting the meaning of a deed of easement, "give the words used by the parties their usual, ordinary, and popular meaning." *Id.* at 161 (internal quotation marks omitted).

Webster's Third New International Dictionary defines "wharf" as a

> structure of timber, masonry, cement, earth, or other material built along or at an angle from the shore of navigable waters (as a harbor or river) and made with a sometimes partially covered platform so that vessels may lie close alongside to receive and discharge cargo and passengers; *specif*: a structure of open rather than filled construction extending parallel to the shoreline.

*Wharf*, *Webster's Third New International Dictionary* 2599 (1993). "Facility" is defined as "something that is built, constructed, installed, or established to perform some particular function or to serve to facilitate some particular end." *Facility*, *Webster's Third New International Dictionary*, *supra*, at 812-13. Read together, the term "Wharf Facility" unequivocally refers to man-made improvements upon a portion of land running adjacent to, or near, a body of water—not to the entirety of Parcel B-2.

Indeed, had the original grantors intended the easements to extend to the entirety of what is now Parcel B-2, they likely would not have specifically designated the easements with reference to the "easternmost portion" of "that certain Wharf Facility," limiting the scope of the property intended for use. Furthermore, the grantors identified that the easements were for the "use" thereof, and described those certain uses, which were mooring a boat by use of a certain pier and using a certain pier for certain recreational purposes. Such described uses only pertain to the actual physical

improvements located on the easternmost portion of the grantor's original land. Additionally, the original grantors conveyed an access easement not to exceed twenty feet in width for the purpose of traversing across "other portions" of the grantor's lands. By its nature, the grantors would not have had to grant such an access easement had their intention been to convey the right to use the entirety of the Parcel B-2.

While a deed may expressly create an easement, it may still fail to specifically define its dimensions. Our Supreme Court has recognized that, when this situation occurs, and the deed language does not state the object or purpose of the easement, the determination of the easement's scope "is made by reference to the intention of the parties to the grant," ascertained from the circumstances pertaining to the parties and the land at the time of the grant. *Waskey v. Lewis*, 224 Va. 206, 211 (1982); *accord Cushman Va. Corp. v. Barnes*, 204 Va. 245, 252 (1963). Where the granting language does state the object or purpose of the easement, however, the dimensions of the easement may be inferred "to be such as are reasonably sufficient for the accomplishment of that object." *Anderson*, 278 Va. at 257 (quoting *Hamlin v. Pandapas*, 197 Va. 659, 664 (1956)). "Instruments 'creat[ing] an easement must be strictly construed, with any doubt being resolved against the establishment of the easement.'" *Forbes v. Cantwell*, 78 Va. App. 454, 466 (2023) (alteration in original) (quoting *Burdette v. Brush Mt. Ests., LLC*, 278 Va. 286, 297 (2009)).

In the absence of any specific definition of the term "Wharf Facility" and in light of the limiting language "easternmost portion," as well as the physical location of the only man-made improvements on Parcel B-2 that were identified in the easement grants, the trial court's interpretation of the deed language was supported by the evidence. The trial court correctly determined that the easements did not extend beyond the physical implements it defined as the "Wharf Facility," which are reasonably sufficient to accomplish the specific uses described in the easements, and for ingress and egress therefrom, as recited in the final order.

- 20 -

*B. The circuit court did not unduly burden or restrict the Tayloes' easement rights.*

The Tayloes argue that the circuit court erred by expressly forbidding crabbing and fishing from the Tayloes' designated pier on the Wharf Facility's bulkheads. By doing this, they allege, the court "appeared to intend to forbid any 'recreational use' activity other than boat launching, mooring, recovery and maintenance." Instead, the Tayloes assert that a correct interpretation of the easements' rights would allow any recreational uses of the Wharf Facility, to include crabbing or fishing from the piers designated for Parcels B-1 and C's uses and parking a vehicle or boat trailer on any portion of the property. The Tayloes are steadfast in their position that so long as the activity is recreational and does not unreasonably interfere with the Kinseys' use of the Wharf Facility, the easements allow it. We disagree.

The original easement language is clear in that its purpose was to allow the grantee and successors to be able to use the Wharf Facility for recreational, as opposed to commercial, boating. The language granted mooring space at a pier for a boat of a particular length; it allowed "ingress and egress to and from the waters of the Commonwealth"; the easement included a further right access of a specified size to and from the Wharf Facility. The original language is clear in the omission of any other use.

"The omission of a term from a written contract evidences intent to exclude it." *Robinson-Huntly v. George Washington Carver Mut. Homes Ass'n*, 287 Va. 425, 430 (2014). Here, the easements are express in that they are for the "use" of "that certain Wharf Facility located on the easternmost portion of the lands of the Grantor" and that the *only* uses described are those related to the use of the physical Wharf Facility's improvements on the easternmost portion of Parcel B-2, and for ingress and egress therefrom. Just as we have held, that if the original grantors intended the entirety of Parcel B-2 to be made servient the grantors would have specified it, so too would the grantors have specified if the easement created other recreational

rights than those listed, including crabbing or fishing from piers.  Furthermore, the act of specifying particular use rights in both easements "shows an intent to exclude" the term "use" therein from meaning or referring to any other specific rights or activities, such as those prayed for by the Tayloes.  *See, e.g.*, *Bently Funding Grp., L.L.C. v. SK&R Grp., L.L.C.*, 269 Va. 315, 330 (2005).

> C.  *The Tayloes' specific parking spaces to park and turn around on Parcel B-2 are gratuitous grants by the trial court but are not required by the easements.*

Attached to its final order, the court included an exhibit that assigns parking spaces "G" and "H" to the owners of Parcels B-1 and C.[7]  The order itself states "[t]hat appurtenant to Parcels B-1 and C is an implied reasonable turn-around easement over the area adjacent to the Wharf Facility in order to enable vehicles . . . to turn around" and that "the owners of Parcels B-1 and C shall have an implied easement to park their respective vehicles, but not trailers, in the parking areas designated for them and depicted on the attached plat."

The Tayloes argue that, based on its misinterpretation of the deeds and the scope of the easements, the circuit court incorrectly limited their access to Parcel B-2 by specifically designating certain parking spaces.  Furthermore, they allege that the parking spaces that the court designated are "within the 20' access easement to the Wharf Facility and intrude and infringe upon that access easement."

Instead, the Tayloes assert that a correct interpretation of Parcels B-1 and C's easement rights does not restrict parking on the entirety of Parcel B-2 in any particular area or space, so long as the parking of a vehicle, trailer or other conveyance does not unreasonably interfere with the rights of the Kinseys.  The Kinseys did not object to the trial court's establishment of the new implied easement.

---

[7] *See supra* footnote 5 for reference to the exhibit cited.

As discussed, the deed language unambiguously limits Parcel B-1 and C's easement rights to those man-made structures located on the easternmost portion of Parcel B-2. Thus, the Tayloes do not have unrestricted access to park or turn around on Parcel B-2 based on the unambiguous language of the deed. Aside from the Tayloes' argument alleging deed misinterpretation, they also claim that those parking spaces encroach on "the 20' access easement" and thus the "court-ordered encroachment improperly burdens the easement rights of Parcels B-1 and C's owners."

This argument is premised on a fundamental misstatement of the access easement. In asserting the existence of this impermissible "encroachment," the Tayloes incorrectly refer to a "[twenty-foot] access easement." Instead, both easements refer to a right of ingress and egress over the "other portions of the land of the Grantor *not exceeding* twenty feet (20') in width as may be reasonably designated and relocated by Grantor . . . from time to time." (Emphasis added). Salt Grove, L.C., consistent with its right to designate the location of the access easement, designated the location by means of physical survey. Salt Grove, L.C., also designated parking spaces for the Tayloes' use, although the subject easement did not grant the Tayloes any right to park vehicles on Parcel B-2.

The Tayloes are correct that the unambiguous deed language does not call for the prescribed parking spots. Because the deed language is unambiguous, the court was not entitled to search outside of the documents or to create, on its own accord, a new easement based on the existing language. *Va. Elec. Power Co.*, 270 Va. at 316. While the trial court's creation of an implied easement for parking may be contrary to law, it is not for those reasons asserted by the Tayloes: only that they claim access to the entirety of parcel B-2 and that the spaces encroach upon the claimed access easement.[8] Further, the Kinseys do not assign any cross error on appeal to the

---

[8] The failure of the appellant to expand their argument and cite authorities beyond those made in support of a reversal of the trial court's interpretation of the easement prevents us from further consideration of this issue. Rule 5A:20.

- 23 -

circuit court's enumeration of parking spots "G" and "H" nor of the turn-around space. For this reason, this Court will not reverse the trial court's order establishing the parking spaces.

       *D. The Tayloes are "bound by rules and regulations applying to all users of the Wharf Facility as may be promulgated from time to time by the owners of Parcel B-2" and the rules and regulations regarding the Wharf Facility need not be unanimously approved by the owners of Parcels B-1, B-2, and C.*

In its final order, the circuit court ruled that "the . . . Declaration . . . does not govern the issues involved in this case." It also held that "the owners of Parcels B-1 and C and their invitees are bound by the covenants and restrictions appearing in their chains of title, and also to the rules and regulations applying to all users of the Wharf Facility as may be promulgated from time to time by the owner of Parcel B-2."

The easements granted to Parcels B-1 and C are subject to the "covenants and restrictions" contained in their chain of title, and the owners of those parcels are bound by "other covenants, rules and regulations applying to all users of the Wharf Facility as may be promulgated from time to time by Grantor, its successors or assigns." While the Tayloes acknowledge this language is contained within their chain of title and the Declaration, they disagree with any interpretation of these provisions that would effectively enable the Kinseys to unilaterally impose rules and regulations on the Wharf Facility. The Tayloes argue that the court was incorrect in deciding that, in part, the Declaration was inapplicable to the easement interpretation issue and further assert that the Declaration makes clear that any modifications in restrictive covenants must be unanimously agreed upon by all owners of the properties. We disagree.

The Tayloes' argument conflates the Declaration and the deeds in their chains of title granting the easements. For this portion of the analysis, the court was correct to separate the two documents.

The Declaration, while partly applicable to the owners of B-1, B-2, and C, contains certain covenants and grants a terminable easement in gross to members of the Steelman family. The

- 24 -

Steelman easement, while similar to that contained later in deeds, is separate and distinct from those easements granted to the owners of Parcels B-1 and C as set forth in the deeds in their respective chains of title. Because the easement specified in the Declaration is not the same as those specified in the deeds, the circuit court was correct to determine that the Declaration does not govern this issue—this issue being one that specifically relates to the easement that runs with the land and now benefits the Tayloes, not the terminable easement granted to members of the Steelman family.

The Declaration was executed in 1993, prior to the subdivision of Parcel B into Parcels B-1 and B-2. While the Declaration contains restrictions governing the use of Parcels B and C, and provides that some of those restrictions "may not be modified, deleted or revised without the consent of a majority of the then living adults," the Tayloes fundamentally misunderstand this limitation. Indeed, this limitation on the ability to modify the restrictions found in the Declaration has no bearing on the easement rights granted to Parcels B-1 and C through the deeds. Instead, the Declaration's plain language clearly establishes its applicability to *only* those modifications to the restrictive covenants affecting the Steelman easement and only to the responsibilities for the upkeep of the Wharf Facility and further limit the "majority" to those comprising the Steelman family.

Turning to the deed language that created the appurtenant easements for Parcels B-1 and C's benefit on Parcel B-2, the Tayloes recognize and acknowledge that they are bound by restrictions in their chain of title, and also, "agree to be bound by other covenants, rules and regulations applying to all users of the Wharf Facility as may be promulgated from time to time by Salt Grove, L.C., its successors and assigns." Thus, the trial court correctly held, consistent with the unambiguous language of the deeds, "That the owners of Parcels B-1 and C and their invitees are bound by the covenants and restrictions appearing in their chains of title, and also to the rules and regulations applying to all users of the Wharf Facility *as may be promulgated from time to time by the owner of Parcel B-2*." (Emphasis added).

Unlike the limited majority approval requirement to modify the restrictions which affect the Steelmans' terminable easement in gross contained within the Declaration, there is no similar requirement contained within the deeds granting the appurtenant easements at issue here. Therefore, the circuit court did not err in its ruling, and the Kinseys are entitled to unilaterally promulgate such reasonable rules and regulations, which apply to all users of the Wharf Facility.

> E. *The trial court did not err in holding that Thornton and Kate committed civil trespass and did not err in enjoining any of the Tayloes.*

In August 2022, the circuit court entered a temporary injunction enjoining the Tayloes from going upon any portion of the Kinseys' property northeast of a line the trial court marked on a copy of the physical survey (Exhibit 5). In its final order, the circuit court found that Thornton and Kate Tayloe committed civil trespass by going on portions of Parcel B-2 that were not included within the Wharf Facility easement. Thornton and Kate were permanently enjoined from going on any portion of Parcel B-2 that is outside the limits of the easements and were further ordered to post a $20,000 bond.

The Tayloes again rely upon their contention that the scope of the Wharf Facility extends to the entirety of Parcel B-2 to assert that the trial court lacked a factual basis: (a) to rule that Thornton and Kate Tayloe "committed civil trespass by going on the portions of Parcel B-2 that were not part of the Wharf Facility easement"; (b) to enjoin them from "going on any portion of Parcel B-2 that is outside the limits" of the man-made improvements specified by the court as the scope of the Wharf Facility; or (c) to require them to post a bond. This argument fails.

As we have held, the trial court's interpretation of the term "Wharf Facility" to refer to those man-made structures on the easternmost portions of Parcel B-2 is supported by the evidence. Further, the scope of the activity allowed by the easement as held by the trial court is supported by the evidence. Therefore, the court had ample factual and legal basis to determine

whether Thornton and Kate had already trespassed, or would trespass in the future, onto portions of Parcel B-2 that were not part of the Wharf Facility easement.

The trial court had ample evidence to rule that Thornton and Kate Tayloe had trespassed such that its bond requirement to ensure compliance with the final order was appropriate. The trial court did not abuse its discretion.

CONCLUSION

Based on the foregoing, the decision of the trial court is affirmed.

*Affirmed.*